FILED
2014 Jun-25  PM 03:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **LINDA P. MUELLER, as Administrator of the Estate of Mark A. Mueller,** )<br><br>**Plaintiff,** )<br><br>**vs.** )<br><br>**CHUGACH FEDERAL SOLUTIONS, INC. and ASHLAND, INC.,** )<br><br>**Defendants.** ) | **Civil Action No. 12-S-00624-NE** |

## MEMORANDUM OPINION

Plaintiff, Linda P. Mueller, commenced this action on February 23, 2012, and asserted various claims arising from her husband's death, allegedly due to his exposure to *Legionella pneumophila* in the workplace, against only Chugach Federal Solutions, Inc. ("Chugach").[1]  Plaintiff twice amended her original complaint,[2] and the final iteration asserted claims against not only Chugach, but also Ashland, Inc. ("Ashland"), for negligent and/or wanton maintenance (Count One), and negligent and/or wanton hiring, training, and supervision (Counts Two through Four).[3]  With

---

[1] *See* doc. no. 1 (Complaint).

[2] *See* doc. no. 2 (First Amended Complaint); *see also* doc. no. 18 (Second Amended Complaint).

[3] *See* doc. no. 18 (Second Amended Complaint), at 4-7.

leave of court, Chugach asserted crossclaims against Ashland for breach of contract and common law indemnity.[4]

The action presently is before the court on ten motions: *i.e.*, Ashland's motion for summary judgment on all of plaintiff's claims;[5] Ashland's motion for summary judgment on Chugach's crossclaims;[6] Ashland's motion to strike inadmissible hearsay evidence submitted in opposition to its motion for summary judgment;[7] Ashland's motion to exclude the expert opinion testimony of Dr. Jeffrey Garber;[8] Ashland's motion to exclude the expert opinion testimony of Dr. James Barbaree;[9] Chugach's motion to exclude the expert testimony of Dr. James Barbaree;[10] Chugach's motion for summary judgment on all of plaintiff's claims;[11] Chugach's motion to strike and/or exclude the expert opinion of Dr. Jeffrey Garber;[12] Ashland's motion to strike the declaration of Chris Hester;[13] and Chugach's motion to strike Ashland's reply brief submitted in support of its motion for summary judgment on Chugach's

---

[4] *See* doc. no. 21 (Order); *see also* doc. no. 22 (Chugach's Crossclaims).

[5] *See* doc. no. 63.

[6] *See* doc. no. 64.

[7] *See* doc. no. 76.

[8] *See* doc. no. 78.

[9] *See* doc. no. 80.

[10] *See* doc. no. 84.

[11] *See* doc. no. 85.

[12] *See* doc. no. 103.

[13] *See* doc. no. 88.

crosslaims.[14]

## I.  MOTIONS TO STRIKE AND TO EXCLUDE

### A.    Motions Addressing Allegedly Inadmissible Hearsay Evidence

Defendants request the court to strike and refrain from considering:  the summary of an August 18, 2011 telephone conference call concerning the investigation of Building 5681 following Mr. Mueller's death that was compiled by Lieutenant Colonel John Completo; and the reference in Mr. Mueller's Huntsville Hospital records to the results of a urine antigen test conducted by the Mayo Clinic in Jacksonville, Florida.[15]   Defendants challenge both pieces of evidence as inadmissible hearsay.[16]

The Federal Rules of Evidence define "hearsay" as "a statement that:  (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).   "Hearsay is not admissible unless any of the following provides otherwise:  a federal statute; these rules; or other rules prescribed by the Supreme Court."  Fed. R. Evid. 802.  Even so, it has long been the rule in the Eleventh Circuit

---

[14] *See* doc. no. 105.

[15] *See* doc. no. 76 (Ashland's Objection to Inadmissible Hearsay Evidence Offered by Plaintiff in Response to its Motion for Summary Judgment); *see also* doc. no. 84 (Chugach's Motion to Exclude the Expert Testimony of Dr. James Barbaree), at 17-20.

[16] *See supra* note 15.

that "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be 'reduced to admissible evidence at trial' or 'reduced to admissible form.'" *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999) (collecting cases).

### 1.    Conference call summary

Plaintiff's briefs in opposition to summary judgment rely upon on a summary of an August 18, 2011 telephone conference call that was prepared by Lieutenant Colonel John Completo.  Participants in that conference included representatives of: the United States Army's Southern Regional Medical Command; the Fox Army Health Clinic on Redstone Arsenal, Alabama; the Centers for Disease Control and Prevention in Atlanta; and, the Alabama Department of Public Health.[17]  Plaintiff relies upon the following statement in the summary:  "Unsure if cooling tower was cleaned, discussion suggested orders were given to clean the cooling tower for a second time — would need to confirm."[18]

---

[17] *See* doc. no. 72 (Plaintiff's Opposition to Ashland's Motion for Summary Judgment), at 10-11, 13, 19-20; *see also* doc. no. 99 (Plaintiff's Opposition to Chugach's Motion for Summary Judgment), at 13-14.

[18] *See* doc. no. 67-1 (Exhibit "O": Legionella Cluster Investigation Report), at ECF 44. "ECF" is the acronym for "Electronic Case Filing," a system that allows parties to file and serve documents electronically.  *See Atterbury v. Foulk*, No. C-07-6256 MHP, 2009 WL 4723547, *6 n.6 (N.D. Cal. Dec. 8, 2009).  Bluebook Rule 7.1.4 *permits* citations to the "page numbers generated by the ECF header."  *Wilson v. Fullwood*, 772 F. Supp. 2d 246, 257 n.5 (D.D.C. 2011) (citing *The Bluebook: A Uniform System of Citation* R. B. 7.1.4, at 21 (Columbia Law Review Ass'n *et al.*, 19th ed. 2010)).  Even so, the Bluebook recommends "against citation to ECF pagination in lieu of original pagination."  *Wilson*, 772 F. Supp. 2d at 257 n.5.  Thus, unless stated otherwise, this court

Defendants contend that the quoted statement constitutes hearsay that cannot be saved by any of the exceptions to the hearsay rule. Ashland also argues that the evidence cannot be presented in an admissible form at trial, based upon the fact that neither Lt. Col. Completo, nor the individual who uttered the statement, has been disclosed as a witness.

Upon consideration, the court finds that defendants' motions to strike are due to be granted. The individual who made the summarized statements has not been identified, and there is no way to determine whether that person has been designated as a trial witness. Therefore, the court cannot assume that the statement can be "reduced to admissible evidence at trial," *Macuba*, 193 F.3d at 1323, and it will not be considered when ruling upon defendants' motions for summary judgment.

## 2. Results of urine antigen test

Defendants also challenge plaintiff's reliance on a portion of Mr. Mueller's Huntsville Hospital records indicating that a urine antigen test was conducted by the Mayo Clinic in Jacksonville, Florida, and produced a positive result for the presence of *Legionella pneumophila*.[19] The contested portion of those records states that Mary

---

will cite the original pagination in the parties' pleadings. When the court cites to pagination generated by the ECF header, it will, as here, precede the page number with the letters "ECF."

[19] *See* doc. no. 76 (Ashland's Objection to Inadmissible Hearsay Evidence Offered by Plaintiff in Response to its Motion for Summary Judgment); *see also* doc. no. 103 (Chugach's Motion and Memorandum of Law in Support of Motion to Strike Statement of Dr. Jeffrey Garber and Exclude Expert Opinions of Dr. Jeffrey Garber), at 7.

Cox, a registered nurse at Huntsville Hospital, spoke over the telephone with Sonya Wilburn of the Mayo Clinic,[20] who stated that the urine antigen test was positive.[21] Defendants contend that the evidence is inadmissible hearsay, because plaintiff does not have a record from the Mayo Clinic or testimony from an employee of the Mayo Clinic proving that the urine antigen test was actually conducted and produced a positive result.

Upon consideration, this court agrees with plaintiff's argument that the results of the test may be reduced to admissible evidence at trial, even though the evidence consists of two levels of hearsay.  Mr. Mueller's Huntsville Hospital records are admissible under the "business records" exception to the hearsay rule, as the records of a regularly conducted activity.  Federal Rule of Evidence 803(6) provides that "a record of an act, event, condition, *opinion*, or *diagnosis*" will be excepted from the hearsay rule if the following are satisfied:

> (A) the record was made at or near the time by — *or from information transmitted by* — someone with knowledge;

> (B) the record was kept in the course of a regularly conducted activity of a business organization, occupation, or calling, whether or not for profit;

---

[20] Sonya Wilburn's position at the Mayo Clinic was not discussed in the parties' briefs or the evidentiary submissions.

[21] *See* doc. no. 89-1 (Exhibit "A": Huntsville Hospital Medical Records), at ECF 4.

6

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6) (emphasis supplied).  Mary Cox's notation in the hospital's records meets each of those conditions.  The record indicates that the entry was made at or near the time that she spoke with Sonya Wilburn of the Mayo Clinic.[22]  Further, Huntsville Hospital is required to maintain medical records in the course of its treatment of patients, and the process of preparing, updating, and storing those records is a regular practice.  In addition, the custodian of the records for Huntsville Hospital signed a certification which states that the records produced were "an exact, full, true and correct copy."[23]  Finally, defendants have not pointed to any evidence indicating a lack of trustworthiness in the source of the information.

Furthermore, the laboratory technician who performed the urine antigen test at the Mayo Clinic could be called to testify, or the results of the urine antigen test might be reflected in the business records of the Mayo Clinic, if they were offered

---

[22] *Id.*

[23] *Id.* at ECF 2.

through the custodian of those records.  For all these reasons, the court will consider the excerpt of Mr. Mueller's medical records indicating a positive urine antigen test when ruling upon the motions for summary judgment discussed later in this opinion.

## B.    Motions to Exclude the Testimony of Dr. Jeffrey Garber

Defendants filed motions to exclude the sworn statement of Dr. Jeffrey Garber on various grounds.[24]   They first argue that the testimony is due to be stricken, because Dr. Garber was not disclosed as an expert before the January 18, 2013 deadline specified in the scheduling order for the disclosure of expert witnesses.[25]  In response, plaintiff states that Dr. Garber was Mr. Mueller's treating physician and, as such, his sworn statement constitutes fact, and not "expert" testimony requiring disclosure in accordance with that provision of the scheduling order.

The Eleventh Circuit has held that a treating physician may offer opinion testimony under Federal Rule of Evidence 701, pertaining to "Opinion Testimony by Lay Witnesses,"[26] when the doctor's opinion is "based on his experience as a

---

[24] *See* doc. no. 78 (Ashland's Objection to Proffer of Expert Opinion Testimony of Jeffrey G. Garber, M.D.); *see also* doc. no. 103 (Chugach's Motion and Memorandum of Law in Support of Motion to Strike Statement of Dr. Jeffrey Garber and Exclude Expert Opinions of Dr. Jeffrey Garber).

[25] *See* doc. no. 16 (Scheduling Order).

[26] Rule 701 provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

physician and [is] clearly helpful to an understanding of his decision making process in the situation." *Williams v. Mast Biosurgery, USA, Inc.*, 644 F.3d 1312, 1316-17 (11th Cir. 2011) (alteration in original) (quoting *Weese v. Schukman*, 98 F.3d 542, 550 (10th Cir. 1996)).  As a result, treating physicians are not subjected to the strictures of Federal Rule of Evidence 702 and Federal Rule of Civil Procedure 26(a)(2) when their testimony concerns "observations based on personal knowledge, including the treatment of a party." *Id.* at 1317 (quoting *Davoll v. Webb*, 194 F.3d 1116, 1138 (10th Cir. 1999)).  Even so, "when a treating physician's testimony is based on a hypothesis, not the experience of treating the patient, it crosses the line from lay to expert testimony, and it must comply with the requirements of Rule 702 and the strictures of *Daubert*," *id.*, as well as the disclosure requirements of Federal Rules of Civil Procedure 26(a)(2) and (b)(4).

Here, Dr. Garber testified that he had served as Mr. Mueller's family physician since 1998.[27]  In addition, Dr. Garber saw Mr. Mueller on July 29, 2011,  and entered

---

       (a) rationally based on the witness's perception;

       (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

       (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.

   [27] *See* doc. no. 107-1 (Exhibit "A": Garber Statement), at 6.

9

the order for him to be admitted to Huntsville Hospital because of severe pneumonia-like symptoms.[28]   Because of the severity of Mr. Mueller's condition, Dr. Garber requested the aid of specialists, including a hematologist, pulmonologist, and infectious disease specialist.[29]   Even so, Dr. Garber visited Mr. Mueller each day to monitor his prognosis, and collaborated with the other physicians in determining a plan of treatment.[30]   Dr. Garber stated that Mr. Mueller was initially placed on a regime of "broad spectrum antibiotics" in an effort to kill the bacteria suspected for a community-acquired pneumonia, which he described as pneumonia involving the germs traditionally found in the community.[31]   Mr. Mueller did not respond to those antibiotics, however, and the team of physicians decided to test for the particular bacteria causing his condition.[32]   At that point, Mr. Mueller was tested for *Legionella*, and the urine antigen test conducted at the Mayo Clinic produced a positive result.[33]   While Dr. Garber stated that he did not personally make the decision to change the antibiotics prescribed, as one of the team of physicians treating Mr. Mueller, he was made aware that Mr. Mueller had been diagnosed with Legionnaires' Disease, and

---

[28] *Id.* at 9-10.

[29] *Id.* at 11-12.

[30] *Id.*

[31] *Id.* at 12.

[32] *Id.* at 13.

[33] Doc. no. 107-1 (Exhibit "A": Garber Statement), at 13.

that the course of treatment had been altered accordingly.[34]  Despite the best efforts

of the team of physicians, Mr. Mueller died a few days later.[35]

Based upon the fact that Dr. Garber consulted with the specialists at Huntsville

Hospital regarding the appropriate course of treatment and closely followed Mr.

Mueller's care, his opinion regarding the cause of death is based upon his personal

experience of treating Mr. Mueller.  *See Williams*, 644 F.3d at 1317.  Thus, Dr.

Garber's sworn statement will be treated as fact testimony for purposes of ruling upon

the motions for summary judgment discussed below, and the motion to strike is due

to be denied.[36]

Furthermore, as the author of Mr. Mueller's death certificate,[37] Dr. Garber may

testify as a fact witness.  *See Binakonsky v. Ford Motor Co.*, 133 F.3d 281, 290 (4th

Cir. 1998); *see also Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12-cv-22481-UU,

2013 WL 5583609, at *5 (S.D. Fla. Aug. 13, 2013).  Defendants have not moved to

exclude the death certificate, which is admissible as a public record of vital statistics.

Fed. R. Evid. 803(9).  Therefore, Dr. Garber is the only witness competent to testify

with respect to the determinations made in and the contents of the death certificate.

---

[34] *Id.* at 15-16.

[35] *Id*. at 16.

[36] Because the court finds that Dr. Garber has provided fact and not expert testimony, it will
not rule on Chugach's argument that Dr. Garber's expert opinion regarding Mr. Mueller's cause of
death is unreliable and should be excluded.

[37] *See* doc. no. 107-2 (Exhibit "B": Alabama Death Certificate).

In addition, Chugach argues that the statement of Dr. Garber, made under oath in question-and-answer format before a court reporter, should not be considered when ruling upon the motions for summary judgment, because it was neither taken after providing notice to defense counsel, nor signed by Dr. Garber. When faced with an identical argument, the Eleventh Circuit held that "[s]worn statements given before court reporters are at least as reliable as signed affidavits and are properly considered on summary judgment." *Bozeman v. Orum*, 422 F.3d 1265, 1267, n.1 (11th Cir. 2005) (citing *In re Sunset Bay Associations*, 944 F.2d 1503, 1510 (9th Cir. 1991); 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kayne, *Federal Practice and Procedure* §§ 2721, 2724 (3d ed. 1998 & Supp. 2005)). Therefore, Chugach's motion to strike is due to be denied, and the court will consider the statement of Dr. Garber.

## C.     Motions to Exclude the Testimony of Dr. James Barbaree

Defendants also have filed motions to exclude the testimony of Dr. James Barbaree.[38] Federal Rule of Evidence 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

---

[38] *See* doc. no. 80 (Ashland's Objection to the Admission of the Expert Report and the Opinion Testimony of James M. Barbaree, Ph.D. and, in the Alternative, Motion for Leave of Court to Identify Expert Witnesses After the Court's Deadline); *see also* doc. no. 84 (Chugach's Motion to Exclude the Expert Testimony of Dr. James Barbaree).

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. That rule compels district courts to "conduct an exacting analysis of the foundations of the expert opinions to ensure they meet the standards for admissibility under Rule 702." *United States v. Abreu*, 406 F.3d 1304, 1306 (11th Cir. 2005) (quoting *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (internal quotation mark and emphasis omitted)).

[T]he objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (alteration supplied).

"The inquiry . . . is a flexible one," because "[m]any factors will bear on the inquiry, and . . . [there is no] definitive checklist or test." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94 (1993) (alterations supplied). Factors that may be relevant include:

(1) whether the theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) in the case of a particular . . . technique, the known or potential rate of error, and (4) whether the theory or technique is generally accepted by the relevant . . . community.

*Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (internal quotation marks and alterations omitted).[39]

## 1.     Dr. Barbaree's background and qualifications

Dr. Barbaree holds an undergraduate and master's degree in microbiology, and a doctorate degree in bacteriology.[40]   He has worked in academia at both the University of West Florida and Auburn University, and for the Centers for Disease Control and Prevention ("CDC") in Atlanta, Georgia.[41]  Dr. Barbaree began working

---

[39] Additional factors that may be taken into account by a district court include:

(1) Whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinion expressly for purposes of testifying;

(2) Whether the expert has unjustifiably extrapolated from an accepted to an unfounded conclusion;

(3) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting;

(4) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

Fed. R. Evid. 702 advisory committee's note to 2000 amendments (internal citations omitted).

[40] *See* doc. no. 74-2 (Deposition of James Barbaree, Ph.D.), at 8-9.

[41] *Id.* at 48, 287, 334.

for the CDC as a microbiologist in 1972.[42]   When he left the CDC approximately

twenty years later, he had risen to Chief of the Respiratory Disease Epidemic

Investigations Lab.[43]   In that position, he was responsible for all laboratory work

conducted as part of a Legionnaires' Disease investigation.[44]  He participated in over

thirty *Legionella* investigations throughout his career at the CDC.[45]

### 2.    Dr. Barbaree's report

Dr. Barbaree submitted an expert report on May 27, 2013, and concluded that

Mr. Mueller "contracted Legionnaires' Disease while working and being around the

cooling tower at building 5681, Redstone Arsenal, Alabama."[46]  He indicated that his

conclusions were based upon a review of materials produced during the course of this

litigation, as well as upon the basis of his experiences as a medical microbiologist and

as a laboratory manager and team member on epidemic investigations of

Legionnaires' Disease during his career at the CDC.[47]

Dr. Barbaree's conclusion that Mr. Mueller contracted Legionnaires' Disease

from the cooling tower adjacent to Building 5681 on Redstone Arsenal was based on

---

[42] *Id.* at 290.

[43] *Id.*

[44] *Id.* at 13.

[45] *Id.* at 291.

[46] *See* doc. no. 74-1 (Opinion of James Barbaree, Ph.D.), at ECF 2.

[47] *Id.*

several factors, including the following considerations:   (1) other "employees exhibiting symptoms that could have been connected with LD [*i.e.*, Legionnaires' Disease]"; (2) the fact that *Legionella pneumophila* and other species of *Legionella* were found in water samples taken from the cooling tower; (3) records showing that the preventive maintenance on the cooling tower at Building 5681 was "questionable in being effective"; and (4) the fact that Mr. Mueller "spent time around the cooling tower since he often smoked in that area."[48]

### a.      Other employees

When addressing the subject of the other employees in the same workplace who also had exhibited symptoms of Legionnaires' Disease, Dr. Barbaree acknowledged that Mr. Mueller was the only *confirmed* case of that disease.  Seven other employees also were tested by means of a urine antigen test, but none were confirmed as having the disease.[49]  Even so, he explained that a *false* urine antigen test does not conclusively show that an individual does not have the disease, because the antigen may or may not be present when the urine sample is taken.[50]  Therefore, he opined that the other employees taking the urine test could not be confirmed as

---

[48] *Id.* at ECF 3-4 (alterations supplied).

[49] *Id.* at ECF 4.

[50] *Id.*

16

either having or not having the disease.[51]

###    b.    Water samples

Further, Dr. Barbaree disagreed with the conclusion stated in the Legionella Cluster Investigation Report promulgated by the Southern Regional Medical Command ("Legionella Cluster Investigation"):  *i.e.,* that the amount of *Legionella pneumophila* found in the water samples gathered from Mr. Mueller's workplace was "a safe low level."[52]  Specifically, Dr. Barbaree stated:

> I do not believe that a CDC epidemiologist who is experienced with LD outbreak investigations would agree with the statement that a low level is safe.  *Legionella* can be present at a low level one day in that sample (another sample at another sampling site may be positive at a high level) and subsequently high soon after.  In one of my research projects at the CDC, we took water samples that had amoebae (most water samples taken in outbreak investigations have protozoa such as amoebae) were negative [*sic*] and incubated them to see if they became positive, and high counts of *L. pneumophila* were shown in some of these water samples.[53]

###    c.    Preventive maintenance

Dr. Barbaree's questioning of the effectiveness of the cooling tower's preventive maintenance was largely based upon the gap in service records from March 24–July 14, 2011.[54]  From that gap, he inferred that there were no disinfectant

---

[51] *Id.* at ECF 4-5.

[52] Doc. no. 74-1 (Opinion of James Barbaree, Ph.D.), at ECF 5.

[53] *Id.* (alteration supplied, emphasis in original).

[54] *Id.*

readings taken at Building 5681 for at least 110 days.[55]  He stated that the free

chlorine level was 0.8 parts per million ("ppm") on July 14, 2011, but a level greater

than 2.0 ppm is necessary to effectively reduce the growth of bacteria.[56]  Dr. Barbaree

also noted that the tower needed to be cleaned twice to eliminate the presence of

*Legionella*.[57]  Further, the July 14, 2011 pH value was 8.2 ppm, but pH should be

maintained *below* 8.0 ppm, so that chlorine is "free to react with the bacteria."[58]  Dr.

Barbaree also stated that the cooling tower should have been cleaned after it was shut

down for seven days in 2011, following the tornado outbreaks that swept across the

State of Alabama.[59]

### 3.   Dr. Barbaree's deposition testimony

Dr. Barbaree testified during deposition that, in his opinion, Mr. Mueller "most

likely" was exposed to *Legionella pneumophila* bacteria that bred in the waters of the

cooling tower adjacent to Building 5681.[60]  When questioned about the methodology

that undergirded his opinion, Dr. Barbaree said that he examined the materials

provided to him by plaintiff's counsel, and relied upon his experience and training as

---

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] Doc. no. 74-1 (Opinion of James Barbaree, Ph.D.), at ECF 5.

[59] *Id.*

[60] *See* doc. no. 74-2 (Deposition of James Barbaree, Ph.D.), at 135.

a microbiologist and CDC laboratory manager.[61]  In response to questions concerning whether his methodology had been tested, Dr. Barbaree stated: "I don't think you can test in each situation such as this in an expert witness testimony.  There's no way you can absolutely test it with all the facts that are presented."[62]  He also testified that he did not know of a peer-reviewed article or publication that approved of his methodology.[63]

In addition, Dr. Barbaree stated that he did not conduct testing in an attempt to rule out the possibility of other sources for Mr. Mueller's Legionnaires' Disease.[64] While Dr. Barbaree acknowledged the possibility that Mr. Mueller could have been exposed to *Legionella* through his use of a home humidifier, showerhead, or water fountain, he testified that he did not inspect or sample any other potential sources because the information he had been provided did not indicate that *Legionella* had been found at those locations.[65]

When questioned about the need for additional water and air sampling, Dr. Barbaree testified that, while he had inspected and conducted air sampling in prior CDC investigations to determine whether water droplets were being released from

---

[61] *Id.* at 123.

[62] *Id.* at 128.

[63] *Id.* at 124-26.

[64] *Id.* at 134-37.

[65] *Id.* at 51-52, 66-69, 134-37, 141, 179.

cooling towers, he did not do so in this case.[66]  In addition, he stated that he did not inspect the cooling tower, the smoking area near the cooling tower, or Building 5681 before forming his opinion.[67]  Dr. Barbaree also testified that he did not take wind measurements to determine the direction in which water droplets or vapor emanating from the cooling tower might travel, or whether such vapors could reach the smoking area allegedly frequented by the deceased.[68]

Dr. Barbaree testified that he did not believe that even one colony-forming unit per milliliter of *Legionella* was safe, despite the fact that guidelines promulgated by the Occupational Safety and Health Administration ("OSHA") set an "action level" of 100 colony-forming units per milliliter.[69]  When questioned about that opinion, Dr. Barbaree stated that he could not identify anyone other than himself who would agree that an amount as small as one colony-forming unit per milliliter is dangerous.  He also testified that he was not aware of any published guideline or study that specifies a recommended standard that is lower than the OSHA guideline, or one that discussed a case in which an individual had contracted Legionnaires' Disease from a cooling tower with a concentration of *Legionella pneumophila* as low as one colony-forming

---

[66] Doc. no. 74-2 (Deposition of James Barbaree, Ph.D.), at 15-16.

[67] *Id.* at 44, 57, 86-87.

[68] *Id.* at 58.

[69] *Id.* at 73-76; *see also* doc. no. 74-1 (Opinion of James Barbaree, Ph.D.), at ECF 3.

unit per milliliter.[70]  When questioned about the OSHA "action level," Dr. Barbaree

testified that he believed it was "difficult to say that there is a safe level of *Legionella*

*pneumophila*, because in the ecology of the organism, when you sample . . . you may

be sampling at a time when the organism hasn't been amplified up,[71] or you may be

sampling in the wrong place."[72]

When questioned about his opinion that Mr. Mueller was exposed to

*Legionella pneumophila* from the cooling tower as a result of being in the smoking

area outside Building 5681, in the shadow of the tower, Dr. Barbaree stated that he

had been informed by plaintiff's counsel that Mr. Mueller was a smoker.[73]  He also

testified that he believed he had read such information in a deposition, but he could

not recall the specific deposition.[74]

### 4.    Analysis

Defendants have raised various challenges to this court's consideration of Dr.

---

[70] *See* doc. no. 74-2 (Deposition of James Barbaree, Ph.D.), at 81-82.

[71] Dr. Barbaree described how *Legionella* may be "amplified" in his expert report:

*Legionella* can live in a planktonic state in water before being disseminated via a mist, but thrive mainly in water by being taken in by protozoa and multiplying intracellularly until the protozoa cell bursts, releasing many *legionellae*.

Doc. no. 74-1 (Opinion of James Barbaree, Ph.D.), at ECF 3 (internal citation omitted).

[72] Doc. no. 74-2 (Deposition of James Barbaree, Ph.D.), at 81-82.

[73] *Id.* at 59.

[74] *Id.* at 59-60.

Barbaree's opinion testimony when ruling upon their motions for summary judgment, as well as its admission at trial, in the event summary judgment should be denied. Defendants first object to Dr. Barbaree's qualifications to render an opinion. Specifically, Ashland challenges Dr. Barbaree's general qualifications, while Chugach only contends that he is not qualified to render an opinion regarding the specific issue of the maintenance of the Building 5681 cooling tower.

Defendants also argue that Dr. Barbaree's testimony should be excluded because it is not based on sufficient facts or data, and because he failed to apply reliable methodology in a reliable fashion.[75]

In addition, Ashland argues that Dr. Barbaree's testimony will not assist the trier of fact.[76]

### a.    Dr. Barbaree's qualifications

Ashland first asserts that Dr. Barbaree is not qualified to offer an opinion in this case, because "he is not an epidemiologist, has never led a *legionella* investigation, and does not know the methodology by which causal inferences are reached by epidemiologists in assessing possible *legionella* exposures."[77]  While Dr.

---

[75] *See* doc. no. 81 (Ashland's Brief in Support of its Motion to Exclude the Testimony of Dr. Barbaree); *see also* doc. no. 84 (Chugach's Motion to Exclude the Expert Testimony of Dr. James Barbaree).

[76] Doc. no. 81 (Ashland's Brief in Support of its Motion to Exclude the Testimony of Dr. Barbaree), at 25-28.

[77] *Id.* at 4-5.

Barbaree's degree is in microbiology and not epidemiology, he has more than twenty years of experience with the CDC, during which time he participated in numerous investigations of *Legionella* outbreaks.[78] Therefore, Dr. Barbaree *is* qualified to offer expert opinion testimony concerning the potential causes of Mr. Mueller's contraction of Legionnaires' Disease by virtue of the knowledge, skill, and experience that he garnered during his extensive career.  *See* Fed. R. Evid. 702 (providing that a witness may be qualified as an expert by virtue of his "knowledge, skill, experience, training, or education").

Chugach objects to Dr. Barbaree's qualifications to offer opinion testimony about cooling tower maintenance:  specifically, that portion of his written report that questioned the effectiveness of the preventive maintenance performed on the Building 5681 cooling tower.[79]  As Chugach notes, Dr. Barbaree testified that he:  is not an expert in cooling tower or HVAC maintenance; has no training in industrial hygiene; and, has no training regarding design or maintenance of industrial HVAC systems or cooling towers.[80]

In response, plaintiff states that Dr. Barbaree "does not seek to offer expert

---

[78] *See* doc. no. 74-2 (Deposition of James Barbaree, Ph.D.), at 288.

[79] *See* doc. no. 84 (Chugach's Motion to Exclude the Expert Testimony of Dr. James Barbaree), at 20-22; *see also* doc. no. 74-1 (Opinion of James Barbaree, Ph.D.), at ECF 5.

[80] *See* doc. no. 74-2 (Deposition of James Barbaree, Ph.D.), at 9-10, 22, 346.

testimony regarding how a cooling tower should be maintained," but, instead, seeks to offer opinions limited to his experience in the investigation of *Legionella* outbreaks and the conditions in which *Legionella pneumophila* flourish.[81]   Thus, plaintiff asserts that Dr. Barbaree should be allowed to offer opinions regarding the cooling tower's water chemistry and its effect on the potential for *Legionella pneumophila* growth.[82]

Because of Dr. Barbaree's experience in investigating *Legionella* outbreaks, he is qualified to testify concerning the conditions under which that bacteria flourishes.   Therefore, he may testify concerning the water chemistry at the cooling tower, and how such chemistry might effect the growth of *Legionella*.   Even so, Dr. Barbaree should not be permitted to testify as to the proper maintenance of a cooling tower, or whether defendants complied with prevailing maintenance standards within the relevant industry.

### b.   Reliability

Defendants contend that Dr. Barbaree's testimony is not reliable.   Specifically, they argue that Dr. Barbaree's conclusions are not based upon sufficient facts or data, because his opinion that Mr. Mueller was exposed to *Legionella* in the outdoor smoking area near the cooling tower of Building 5681 is based on assumptions, and

---

[81] *See* doc. no. 96 (Plaintiff's Response in Opposition to Chugach's Motion to Exclude the Expert Testimony of Dr. James Barbaree), at 13.

[82] *Id.*

not supported by evidence; because his opinion that the cooling tower was not being properly maintained is based on false assumptions; because he did not test for other potential sources of *Legionella*; and because the amount of *Legionella* found in the water sample was far below the action level specified in OSHA regulations. Additionally, defendants attack Dr. Barbaree's methodology as being of his own creation, and not subjected to testing or peer review.

The court is not persuaded by defendants' arguments. While Dr. Barbaree could not recall the basis for his opinion that Mr. Mueller frequented the smoking area in question during his deposition, Mrs. Mueller testified that her husband was a smoker, and that he regularly took smoke breaks during the work day at the designated area outside of Building 5681.[83]

The remaining objections raised by defendants regarding Dr. Barbaree's statements concerning the smoking area — *i.e.*, that he did not observe or inspect the building or smoking area, and that he did not calculate the drift of water vapor or measure the direction of the winds in the area — are more properly viewed as cross-examination material that may affect the *weight* to be accorded the testimony by the finders of fact, but not its *admissibility*. As the Eleventh Circuit stated in *Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333 (11th Cir. 2003):

---

[83] *See* doc. no. 87-1 (Deposition of Linda Mueller), at 50-52.

In the end, although "[r]ulings on admissibility under *Daubert* inherently require the trial court to conduct an exacting analysis of the proffered expert's methodology," *McCorvey* [*v. Baxter Healthcare Corp.*,] 298 F.3d [1253,] 1256 [(11th Cir. 2002)], it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence. Indeed, as we said in *Maiz* [*v. Virani*, 253 F.3d 641 (11th Cir. 2001)], "[a] district court's gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury.'" 253 F.3d at 666 (quoting *Allison v. McGhan*, 184 F.3d 1300, 1311 (11th Cir. 1999)). Quite the contrary, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596, 113 S. Ct. at 2798 . . . .

*Id.* at 1341 (first, sixth and seventh alterations in original, all other alterations supplied).

Defendants also assert that Dr. Barbaree's opinion that the cooling tower was not being properly maintained is based on false assumptions. Defendants first argue that Dr. Barbaree's assumption that the chemical levels were not monitored for a 110-day period is in direct contradiction with the depositions of two Chugach employees, David Dyer and Chris Hester. In their depositions, those employees relied on Mr. Dyer's personal notes which reflected six adjustments to the biocide injection system from March 24 to July 14, 2011.[84] Even so, as Dr. Barbaree noted in his report, there is no record that *Ashland* — the entity responsible for reading and adjusting the water

---

[84] *See* doc. no. 87-7 (Deposition of David Dyer), at 131-33; *see also* doc. no. 87-8 (Deposition of Chris Hester), at 54-55, 140.

chemistry of the cooling tower — made a service visit to the tower during that 110-day period.[85]  Because this issue appears to be in dispute, it is not a proper basis for excluding the testimony of Dr. Barbaree as unreliable, but is again material for use during cross-examination, to affect the *weight* the jury may choose to give the testimony, but not its *admissibility*.  *See Quiet Technology*, 326 F.3d at 1341.

Defendants next argue that Dr. Barbaree's assumption that the cooling tower was cleaned twice is based on false assumptions.  In his expert report, Dr. Barbaree stated that, "when the tower was cleaned later, it had to be cleaned twice to show no *Legionella*."[86]  Dr. Barbaree's assumption is drawn from Lt. Col. Completo's telephone conference call summary, which includes this statement: "Unsure if cooling tower was cleaned, discussion suggested orders were given to clean the cooling towers for a second time — would need to confirm."[87]  This court previously held that the conference call summary should be stricken from the record, because it constitutes inadmissible hearsay evidence.  Even so, "expert opinions based on otherwise inadmissible hearsay" may be admitted, "if the facts or data are 'of the type reasonably relied upon by experts in the particular field in forming opinions or

---

[85] *See* doc. no. 74-1 (Opinion of James Barbaree, Ph.D.), at ECF 5; *see also* doc. no. 74-2 (Deposition of James Barbaree, Ph.D.), at 88-89, 104.

[86] *See* doc. no. 74-1 (Opinion of James Barbaree, Ph.D.), at ECF 5.

[87] *See* doc. no. 67-1 (Exhibit "O": Legionella Cluster Investigation Report), at ECF 44.

inferences upon the subject.'" *Daubert*, 509 U.S. at 595 (citing Fed. R. Evid. 703). Upon consideration, this court finds that the contents of the Legionella Cluster Investigation Report, including all of its enclosures, are "of the type reasonably relied upon by experts" in Dr. Barbaree's field.  *Id.*

In addition, Ashland contends that Dr. Barbaree's testimony is unreliable because he failed to test other potential sources of the *Legionella* contamination. Specifically, Ashland asserts that Dr. Barbaree merely assumed Mr. Mueller was not exposed to *Legionella* that bred in the hot water heaters or plumbing systems of the apartment he occupied during the period in which Mr. Mueller was separated from his wife, or in his wife's home, even though Dr. Barbaree acknowledged that such systems are known sources for *Legionella*.[88]   Again, Dr. Barbaree's failure to test other potential sources of Mr. Mueller's illness goes to the *weight*, rather than the *admissibility*, of his expert opinion.  *See Quiet Technology*, 326 F.3d at 1341.

Ashland further asserts that Dr. Barbaree's expert opinion is not based upon sufficient facts or data, because only one colony-forming unit per milliliter of *Legionella* bacteria was found in the cooling tower's water sample, while OSHA regulations indicate that an "action level" is 100 colony-forming units.[89]   While the

---

[88] *See* doc. no. 81 (Ashland's Brief in Support of its Motion to Exclude the Expert Testimony of Dr. Barbaree), at 20-21.

[89] *Id.* at 20.

amount of *Legionella* found in the water samples was much lower than that of OSHA's action level, Dr. Barbaree's opinion that a low level of *Legionella* should not be characterized as "safe" was based upon personal experience acquired during his extensive career of investigating *Legionella* outbreaks, and does not make his opinion inherently unreliable. Therefore, this challenge also goes more to the *weight* of Dr. Barbaree's expert opinion, rather than its *admissibility*. *Id.*

Additionally, the fact that Dr. Barbaree based his testimony on his own experience, and could not cite any peer-reviewed article or publication approving his methodology, does not necessarily disqualify him as an expert. *See* Fed. R. Evid. 702, advisory committee's notes to 2000 amends. ("Nothing in this amendment is intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony . . . . In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.") Instead, it must be established, by considerations other than the expert's experience, that his methodology is reliable. *Cf. United States v. Frazier*, 387 F.3d 1244, 1260-61 (11th Cir. 2004) ("Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable *any* conceivable opinion the expert may express.") (emphasis in original).

     **c.**    **Relevance**

Ashland next asserts that Dr. Barbaree's testimony will not assist the trier of fact, because there is "an analytical chasm between the data . . . and [his] proffered opinion."[90]  Therefore, Ashland contends that his testimony "is merely a conclusion at which the jurors could arrive on their own and that requires no scientific or specialized knowledge."[91]  The Supreme Court addressed the subject of the relevance of proffered expert testimony in *Daubert*, saying:

> Rule 702 . . . requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue."  This condition goes primarily to relevance.  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." 3 Weinstein & Berger ¶ 702[02], p. 702-18.  See also *United States v. Downing*, 753 F.2d 1224, 1242 (CA3 1985) ("An additional consideration under Rule 702 — and another aspect of relevancy — is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute").  The consideration has been aptly described . . . as one of "fit."  *Ibid*.

*Daubert*, 509 U.S. at 591.

There simply is no question that Dr. Barbaree's testimony is relevant in the first sense discussed in *Daubert*, because a central issue in this case will concern the underlying exposure to *Legionella* that caused Mr. Mueller's illness.  Furthermore, Dr. Barbaree's expert opinion is sufficiently tied to the facts of the case because, when forming his opinion, he considered these facts:  other employees had exhibited

---

[90] *Id.* at 25-28 (alteration supplied).

[91] *Id.*

symptoms that could be connected to Legionnaires' Disease; bacteria was found in water samples taken from the cooling tower; there was a potential 110-day period during which the cooling tower was not chemically treated; and, Mr. Mueller spent time in the outside designated smoking area near the cooling tower.[92]   Therefore, his expert opinion has "a valid scientific connection to the disputed facts in the case." *Quiet Technology*, 326 F.3d at 1347-48 (quoting *Allison*, 184 F.3d at 1312).

### 5.    Unsworn report

Ashland next asserts that Dr. Barbaree's report should be stricken because it is not a sworn statement.[93]   In response, plaintiff contends that the defect was corrected when Dr. Barbaree recognized and identified his report under oath during his deposition.[94]   Plaintiff also argues that, because the report was provided to Ashland in June of 2013, there would be no prejudice to defendants by allowing a verification to be added now.[95]

> Only "pleadings, depositions, answers to interrogatories, and admissions *on file*, together with *affidavits*" can be considered by the district court in reviewing a summary judgment motion.   Fed. R. Civ. P. 56(c) (emphasis added).   "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible

---

[92] *See* doc. no. 74-1 (Opinion of James Barbaree, Ph.D.), at ECF 4-5.

[93] *See* doc. no. 81 (Ashland's Brief in Support of its Motion to Exclude the Expert Testimony of Dr. Barbaree), at 2-4.

[94] *See* doc. no. 91 (Plaintiff's Opposition to Ashland's Motion to Exclude Dr. Barbaree's Expert Report), at 2-3.

[95] *Id.* at 3.

in evidence, and shall show affirmatively that the affiant is competent
to testify to the matters related therein." Fed. R. Civ. P. 56(e). Unsworn
statements "do [ ] not meet the requirements of Fed. Rule Civ. Proc.
56(e)" and cannot be considered by a district court in ruling on a
summary judgment motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144,
158 n.17, 90 S. Ct. 1598, 1608-09 n. 17, 26 L. Ed. 2d. 142 (1970).

*Carr v. Tatangelo*, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003) (emphasis and
alterations in original).

Even so, Federal Rule of Civil Procedure 56(e)(1) provides that, "[i]f a party
fails to properly support an assertion of fact[,] . . . the court may give an opportunity
to properly support . . . the fact." Fed. R. Civ. P. 56(e)(1) (alterations supplied).
Consistent with that rule, a "number of district courts have permitted affidavits to
cure previously unsworn materials." *DG & G, Inc. v. FlexSol Packaging Corp. of
Pompano Beach*, 576 F.3d 820, 826 (8th Cir. 2009); *see also Hudson v. Pennsylvania
Life Insurance Co.*, Civil Action No. CV-12-S-2225-NE, 2013 WL 3242877, at *10
(N.D. Ala. June 21, 2013); *Volterra Semiconductor Corp. v. Primarion, Inc.*, 796 F.
Supp. 2d 1025, 1038-39 (N.D. Cal. 2011) (overruling an objection to unsworn expert
reports where the proponent provided a sworn declaration from the expert with the
challenged reports attached); *Strauss v. DVC Worldwide, Inc.*, 484 F. Supp. 2d 620,
634 (S.D. Tex. 2007) ("While filing [an] unsworn expert report did not constitute
admissible summary judgment evidence, see Fed. R. Civ. P. 56(e), that deficiency was

cured by filing the sworn declaration . . . .") (alteration supplied); *Medtronic Xomed, Inc. v. Gyrus ENT LLC*, 440 F. Supp. 2d 1300, 1310 n.6 (M.D. Fla. 2006) (holding that an expert report was properly before the court in considering motions for summary judgment because the expert had identified his unsworn report during his deposition); *Maytag Corp. v. Electrolux Home Products, Inc.*, 448 F. Supp. 2d 1034, 1064 (N.D. Iowa 2006) ("This court concludes that subsequent verification or reaffirmation of an unsworn expert's report, either by affidavit or deposition, allows the court to consider the unsworn expert's report on a motion for summary judgment."); *Gache v. Town of Harrison*, 813 F. Supp. 1037, 1052 (S.D.N.Y. 1993) ("To the extent defendants seek to strike the submissions . . . as unsworn reports by experts, the issues have been mooted by plaintiff's submission of sworn declarations by each of these individuals swearing to the veracity of their statements.").

Because Ashland received a copy of the report in June of 2013, more than two months before plaintiff responded to its motion for summary judgment, and because plaintiff submitted the August 12, 2013 deposition of Dr. Barbaree — in which the expert report was identified under oath and marked as an exhibit — in opposition to the motions for summary judgment, Dr. Barbaree's expert report is properly before the court in opposition to defendants' motions for summary judgment.

### 6.    Ashland's alternative motion for time to obtain and disclose experts

Because this court will overrule defendants' motions to exclude the testimony of Dr. Barbaree, it must now address Ashland's alternative motion for "a reasonable time, at least 30 days, within which to obtain and disclose one or more experts to address any expert opinions of Dr. Barbaree . . . ."[96]

According to the initial scheduling order entered in this case, plaintiff was required to disclose her experts on or before January 18, 2013, and defendants were required to disclose their experts on or before February 22, 2013.[97]  This court later extended the deadline for defendants to disclose their experts to May 23, 2013, and the deadline for dispositive motions to August 1, 2013.[98]  Plaintiff did not disclose any expert witnesses before her January 18, 2013 deadline.  Even so, on May 9, 2013, plaintiff requested leave of court to file the expert report of Dr. Barbaree after the deadline,[99] which this court granted on August 1, 2013.[100]  Therefore, Ashland asserts that it did not have a reason to retain and disclose an expert by its May 23, 2013 deadline, and should now be allowed a reasonable time within which to obtain experts to address the opinions of Dr. Barbaree.

---

[96] Doc. no. 81 (Ashland's Brief in Support of its Motion to Exclude the Expert Testimony of Dr. Barbaree), at 28-29.

[97] *See* doc. no. 16 (Scheduling Order).

[98] *See* doc. no. 40 (Order dated Apr. 3, 2013).

[99] *See* doc. no. 41 (Motion for Leave to File Expert Witness Report After Deadline).

[100] *See* doc. no. 68 (Order dated Aug. 1, 2013).

Ashland failed to note in its motion, however, that this court also extended the deadline for conducting discovery on expert witnesses until August 21, 2013 when it granted plaintiff's motion for leave to file Dr. Barbaree's report out of time.[101]  At the very least, Ashland should have filed a motion for leave to retain its own expert during that period, and the court would then also have entertained a further extension of the deadlines for discovery and dispositive motions.  Therefore, Ashland's motion for a reasonable time to obtain an expert will be denied.

## D.    Chugach's Motion to Strike Ashland's Reply Brief

Chugach asks the court to strike the  reply brief that was submitted by Ashland in support of its motion for summary judgment on Chugach's crossclaims,[102] and cites Ashland's non-compliance with Appendix II of the Uniform Initial Order entered in this case.[103]  Specifically, Chugach asserts that Ashland's thirteen-page reply brief exceeds the ten-page limitation dictated by the Uniform Initial Order.[104]  In addition, Chugach contends that Ashland violated the Uniform Initial Order when it addressed Chugach's disputes with the allegedly undisputed facts set out in the initial motion

---

[101] *Id.*

[102] *See* doc. no. 82 (Ashland's Reply Brief in Support of its Motion for Summary Judgment on Chugach's Crossclaims).

[103] *See* doc. no. 105 (Chugach's Motion to Strike Ashland's  Reply Brief in Support of its Motion for Summary Judgment); *see also* doc. no. 14 (Uniform Initial Order).

[104] *See* doc. no. 14 (Uniform Initial Order), at 13 (stating that "[r]eply briefs are limited to ten pages.") (alteration supplied).

for summary judgment.[105]

Ashland filed its motion for summary judgment on July 31, 2013.[106] This court granted plaintiff's motion to file the expert report of Dr. James Barbaree out of time one day later.[107]   Because of plaintiff's four-month delay in filing that report, however, this court entered an amended scheduling order which allowed for additional discovery and extended the deadline for dispositive motions from August 1, 2013 to September 20, 2013.[108]

Following the entry of that order, plaintiff's counsel took the depositions of Chugach employees David Dyer and Chris Hester on August 15, 2013.[109]   Ashland asserts that Chugach relied heavily on those depositions in its response brief, and that such testimony was not available when Ashland filed its initial motion for summary judgment.[110]   Further, in its reply brief, Ashland acknowledged that portions of its brief were not permissible under the specific terms of the Uniform Initial Order, and sought "leave of Court" to address Chugach's assertions that were based upon those

---

[105] *Id.* at 16 ("The reply submission, if any, shall consist of only the moving party's disputes, if any, with the non-moving party's *additional* claimed disputed and undisputed facts") (emphasis supplied).

[106] *See* doc. no. 64 (Ashland's Motion for Summary Judgment on Claims Made Against it by Chugach).

[107] *See* doc. no. 68 (Order dated Aug. 1, 2013).

[108] *Id.* at 15-16.

[109] *See* doc. no. 106 (Ashland's Response to Chugach's Motion to Strike Ashland's Reply Submission) ¶ 2.

[110] *Id.* ¶ 3.

belated depositions.[111]   Therefore, the motion to strike Ashland's reply brief will be denied.

**E.      Ashland's Motion to Strike the Declaration of Chris Hester**

Chugach submitted a declaration from Chris Hester, its HVAC Mechanical Supervisor for Redstone Arsenal, in support of its motion for summary judgment on all of plaintiff's claims.[112] Mr. Hester identified and sought to authenticate Chugach's subcontract with Ashland, and various documents relating to the extension of that contract.[113]   Ashland filed a "response" to Chugach's motion, stating that it did not oppose the entry of summary judgment in favor of Chugach, but arguing, nevertheless, that Chris Hester's declaration should be stricken.  Ashland stated three different grounds for that contention: (1) the declaration contradicted Hester's sworn deposition testimony; (2) Hester lacked personal knowledge to authenticate the exhibits to his declaration; and (3) the declaration was a belated and backdoor means of submitting evidence in opposition to Ashland's motion for summary judgment on Chugach's crossclaims.[114]

The Eleventh Circuit has held that "a party cannot give 'clear answers to

---

[111] *See* doc. no. 82 (Ashland's Reply Brief in Support of its Motion for Summary Judgment on Chugach's Crossclaims), at 8 n.2.

[112] *See* doc. no. 85 (Chugach's Motion for Summary Judgment).

[113] *See* doc. no. 87-13 (Declaration of Chris Hester).

[114] *See* doc. no. 88 (Ashland's Response to Chugach's Motion for Summary Judgment), at 2.

unambiguous questions' in a deposition and thereafter raise an issue of material fact in a contradictory affidavit that fails to explain the contradiction." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987) (quoting *Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984)).  The Eleventh Circuit has cautioned, however, that this so-called "sham affidavit" rule should be applied "'sparingly because of the harsh effect it may have on a party's case.'" *Allen v. Board of Public Education for Bibb County*, 495 F.3d 1306, 1316 (11th Cir. 2007) (quoting *Rollins*, 833 F.2d at 1530).  Indeed, courts are advised to

> be careful to distinguish "between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986).
>
> > [E]very discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence.  In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an early deposition.
>
> *Id.* at 954 (quoting *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980)) (alteration in original) (citation omitted).

*Faulk v. Volunteers of America*, 444 F. App'x 316, 318 (11th Cir. 2011).

Ashland asserts that Hester's declaration is inadmissible because it contradicts his sworn deposition statement that he had never seen the contract between Chugach

and Ashland:

Q.     Now, are you familiar with the agreement between Ashland and Chugach as it relates to cooling water treatment?

A.     When you say familiar?

Q.     Have you seen it?

A.     This?  No, I have not.

Q.     Well, is it your understanding or were you ever told — were you ever told or instructed by your supervisors that the agreement with Ashland stated that Ashland was to provide once a week routine plant service visit[s] for each listed boiler and 25 percent of the listed cooling towers?

A.     No, I was not told by my supervisor that, my boss, that was the agreement.

Q.     You were never told that?

A.     No.

Q.     You never knew that the agreement between Chugach and Ashland stated that Ashland was to provide once a week routine plant service visit[s] for each listed boiler and 25 percent of the listed cooling towers?

A.     I knew that, but I was not told by him that.

Q.     How did you know it?

A.     Because we had extended our agreement with Ashland over the period I was supervisor and we would meet with Ashland and discuss that.

39

Q.      You would learn it in a meeting?

A.      Well, me and Ashland would — Ashland, whoever it may be at that time, whoever was the guy, would sit down and discuss the extension of the contract and then in that extension I would — we would discuss what was required of them.  And that's how I knew.

. . . .

Q.      So every tower covered under the contract with Ashland was supposed to be visited once a month?

A.      That was the goal.  Now —

Q.      Well, that's what the contract says; isn't it?

A.      Yes.  That's what — now, I don't know what that contract — I have never seen that contract.

Q.      I'll show you — and, again, it was provided and attached as an exhibit —

A.      I understand.

Q.      — to a filing in this matter, so.

A.      Sure.

. . . .

Q.      It appears to me the plain language of reading that would say that they were — that Ashland was supposed to provide once a week routine plant service visit[s]; correct?

A.      That's what it reads.

Q.      For the boilers, and 25 percent of the cooling towers —

40

A.    Uh-huh.  (Affirmative.)

Q.    — right? Is that a yes?

A.    I'll agree that that's what it says, yes.

Q.    Okay.  Y'all are saying — y'all had an agreement to do something different than what the contract says?

A.    This contract is not necessarily, in my opinion, the contract that they were working on with me.

Q.    So you had an agreement with them that was different than what's in writing there?

A.    Possibly.  The contract that they was working with with me may not be or may be this.  I did not see either one, but I sat in when they sold and resold and repitched the contract with them, and other companies as well who bid it, but I did not get to see the new accepted contract.  You hear me?  Because this is the original contract in 2003 and in 2003 I was not the supervisor.[115]

In response, Chugach states that Hester did not testify during his deposition that he had never seen a contract, but rather that "he had never seen the contract marked as Plaintiff's Exhibit 9 to his deposition."[116]  In addition, Chugach asserts that "[t]he document about which Mr. Hester was questioned during his deposition

---

[115] Doc. no. 87-8 (Deposition of Chris Hester), at 34-40 (alterations supplied); *see also id.* at 48 ("I'll repeat, I have never seen this contract . . . ."); *id.* at 128 ("because I've already told you I have not seen the contract that was agreed upon, but I sat in the meeting where they sold their pitch, I sat in the meeting where they told what they was [*sic*] going to do, but I have not seen a piece of paper — the contract, . . .").

[116] *See* doc. no. 98 (Chugach's Opposition to Ashland's Motion to Strike Evidence Submitted in Support of Motion for Summary Judgment), at 4.

(Exhibit 9) and the contract attached as Exhibit A to his Declaration are not the same document."[117]

Upon consideration, the court finds that there are inconsistencies between Hester's deposition testimony that "I sat in the meeting where they sold their pitch, I sat in the meeting where they told what they was [*sic*] going to do, but I have not seen a piece of paper — the contract," and the subsequent statements in his declaration that the appended contracts were true and correct copies of the agreement between Chugach and Ashland.[118]   Because Hester testified that he never saw the contracts entered into between Chugach and Ashland, he cannot now attempt to authenticate those same contracts.  Therefore, Ashland's motion to strike will be granted.[119]

## II. MOTIONS FOR SUMMARY JUDGMENT

The Federal Rules of Civil Procedure provide that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In

---

[117] *Id.* (alteration supplied).

[118] *Compare* doc. no. 87-8 (Deposition of Chris Hester), at 128, *with* doc. no. 87-13 (Declaration of Chris Hester), at ECF 3.

[119] Because the court finds that Hester's declaration is inconsistent with his earlier deposition testimony, it will not rule on Ashland's arguments that Hester lacks personal knowledge to authenticate the exhibits to his declaration and that the declaration is a belated attempt to submit evidence in opposition to Ashland's motion for summary judgment on Chugach's crossclaims.

other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 918, 921 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983). Additionally,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (alteration supplied); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## III. SUMMARY OF FACTS

### A.   The Parties

Plaintiff asserts claims against defendants, both individually and in her representative capacity as the administrator of the estate of her deceased husband, Mark A. Mueller.[120]   Throughout the relevant time period, Mr. Mueller was an employee of the Camber Corporation, a contractor performing work for the United States Army on Redstone Arsenal.[121]   His workplace was located in Building 5681.[122]

Chugach Management Services, Inc. ("Chugach Management"), a subsidiary of the Chugach Alaska Corporation, held the "Installation Support Services Contract," an agreement that required the maintenance of heating, ventilation, and air conditioning ("HVAC") systems serving buildings located on Redstone Arsenal.[123] Chugach Management entered into a water treatment subcontract with Ashland for the servicing of HVAC cooling towers in 2003.[124]   Defendant Chugach Federal

---

[120] *See* doc. no. 18 (Second Amended Complaint).

[121] *Id.* ¶ 4.

[122] *Id.*

[123] *See* doc. no. 87-7 (Deposition of David Dyer), at 28-29; *see also* doc. no. 87-11 (Deposition of Rob Spencer), at 10; doc. no. 87-12 (Deposition of Stacy Willis), at 74; doc. no. 87-8 (Deposition of Chris Hester), at 28-34; doc. no. 87-5 (Affidavit of Chris Hester) ¶ 2; doc. no. 87-9 (ISS Contract), at ECF 2.

[124] *See* doc. no. 87-7 (Deposition of David Dyer), at 28-29; *see also* doc. no. 87-11 (Deposition of Rob Spencer), at 10; doc. no. 87-12 (Deposition of Stacy Willis), at 74; doc. no. 87-8 (Deposition of Chris Hester), at 28-34; doc. no. 87-5 (Affidavit of Chris Hester) ¶ 2; doc. no. 87-9 (ISS Contract), at ECF 2.

Solutions, Inc., another subsidiary of the Chugach Alaska Corporation, obtained the Installation Support Services Contract in 2011.[125]  Ashland's subcontract for water treatment services was periodically renewed from 2003 until March 31, 2012.[126]

## B.  Maintenance of the HVAC Cooling Tower for Building 5681

### 1.  Relevant individuals

Chris Hester was the HVAC Mechanical Supervisor for Chugach.[127]  As such, he supervised the maintenance of HVAC systems and cooling towers serving buildings on Redstone Arsenal, including Building 5681, and managed a team of employees that included HVAC technicians, control technicians, electricians, plumbers, and filter changers.[128]  When Hester was hired in 2003, he had over fifteen years of experience working with industrial HVAC systems, and had served as a master mechanic for ten years.[129]  In addition, he had obtained a certificate from the National Air Refrigeration Services ("NARS") School, and was licensed by the State of Alabama as a HVAC mechanical contractor and a refrigeration contractor.

David Dyer was an on-site HVAC mechanic for Chugach, and was responsible

---

[125] *See* doc. no. 87-7 (Deposition of David Dyer), at 14-15; *see also* doc. no. 87-5 (Affidavit of Chris Hester) ¶ 7.

[126] *See* doc. no. 87-14 (Deposition of Doug Entz), at 123-24, 132-33, 136; *see also* doc. no. 87-8 (Deposition of Chris Hester), at 24, 36.

[127] *See* doc. no. 87-8 (Deposition of Chris Hester), at 23-24.

[128] *Id.*

[129] *See* doc. no. 87-5 (Affidavit of Chris Hester) ¶ 3.

for the maintenance of cooling towers, including the tower that serviced Building 5681.[130]  He obtained a certificate in air conditioning and refrigeration from the City Technical School in Huntsville, Alabama, and had over ten years of experience with industrial HVAC systems at the time that he was hired.[131]  As an HVAC mechanic, Dyer was responsible for ensuring that the chemical reservoirs for the biocide injector system were full, and that the system was operating properly.[132]  Even so, Dyer does not have experience in either water chemistry or *Legionella* detection and prevention, and he was not trained to adjust the chemical feed for the cooling tower.[133]

The number of Ashland employees who inspected the Building 5681 cooling tower in 2011 is in dispute.  Ashland asserts that there were three service technicians: Leonard Schwartz; Stacy Willis; and Rob Spencer.[134]  Leonard Schwartz was employed by Ashland as an "Application Engineer I" from July 1, 2008 until July 1, 2011.[135]  He possesses a Bachelor of Science degree in chemical engineering, and had seven years of experience in water treatment when he was hired in 2008.[136]  Stacy Willis served as Ashland's  account manager for northern Alabama from July 11,

---

[130] *See* doc. no. 87-7 (Deposition of David Dyer), at 30, 74, 79, 125.

[131] *Id.* at 18-19, 24-25; *see also* doc. no. 87-10 (Affidavit of David Dyer) ¶ 3.

[132] *See* doc. no. 87-7 (Deposition of David Dyer), at 26-27.

[133] *Id.* at 50, 52, 68, 102.

[134] *See* doc. no. 65 (Ashland's Brief in Support of its Motion for Summary Judgment), at 3-4.

[135] *See* doc. no. 66-4 (Exhibit "D": Affidavit of Leonard Schwartz), at 3.

[136] *Id.*

2011 until October of 2012.[137]  When he was hired, he had several years of experience in water treatment, and had been trained while working for Ashland's competitor, Nalco, a subsidiary of Ecolab, Inc.[138]  Rob Spencer was hired by Ashland as a service technician on July 11, 2011.[139]  Prior to his employment with Ashland, Spencer had received basic water treatment training in the United States Navy.[140]  In addition, he acquired additional skills from on-the-job-training by Stacy Willis, and through Ashland's online training program.[141]

Chugach contends that, following the end of Leonard Schwartz's employment on July 1, 2011, there was frequent turnover in the Ashland service technicians sent to Building 5681.[142]  Chugach asserts that Ashland dispatched a total of eleven different technicians after July 1, 2011.[143]

### 2.    Services provided by Ashland

Ashland was responsible for providing the chemicals used to treat cooling

---

[137] *See* doc. no. 87-12 (Deposition of Stacy Willis), at 10-11.

[138] *Id.* at 13-14.  "Nalco" was formed in 1928 as the National Aluminate Corporation; however, the company's name was later changed to "Nalco" as a result of multiple mergers and acquisitions.  *See* http://www.nalco.com/aboutnalco/history.htm (last visited June 13, 2014).

[139] *See* doc. no. 87-11 (Deposition of Rob Spencer), at 11-12.

[140] *Id.* at 23.

[141] *Id.* at 11-12, 24.

[142] *See* doc. no. 87-7 (Deposition of David Dyer), at 64-65; *see also* doc. no. 87-8 (Deposition of Chris Hester), at 50.

[143] *See* doc. no. 87-8 (Deposition of Chris Hester), at 50.

tower waters, and for periodic inspection of the towers.[144]  Chemical treatment of cooling tower water is necessary to prevent scale corrosion and microbiological growth, including the *Legionella* bacteria.[145]  Even so, Chugach did not retain Ashland to test or sample the cooling tower waters for the presence of *Legionella*.[146]

Ashland provided two chemicals for the treatment of cooling tower waters: "Drew 2215," a phosphate used to reduce the level of rust, corrosion, and inorganic material in the waters;[147] and "Biosperse 3001," which essentially is a bleach used to reduce the concentration of algae, bacteria, and fungi in the waters.[148]

Ashland's contract required weekly visits to Redstone Arsenal, and the inspection of each cooling tower at least once each month.[149]  Typically, when an Ashland service employee arrived at Chugach's maintenance building on Redstone Arsenal each week, Dyer would drive the Ashland representative to the cooling towers that were to be inspected that week.[150]  For that reason, the parties disagree

---

[144] *See* doc. no. 66-2 (Exhibit "B": Solicitation Packet for Boiler and Cooling Water Treatment).

[145] *See* doc. no. 87-14 (Deposition of Doug Entz), at 114.

[146] *See* doc. no. 65 (Ashland's Brief in Support of its Motion for Summary Judgment), at 3.

[147] *See* doc. no. 66-6 (Exhibit "F": Drew 2215 Product Data Sheet).

[148] *See* doc. no. 66-7 (Exhibit "G": Biosperse 3001 Product Data Sheet).

[149] *See* doc. no. 87-12 (Deposition of Stacy Willis), at 21; *see also* doc. no. 87-7 (Deposition of David Dyer), at 35-36, 107-08; doc. no. 87-8 (Deposition of Chris Hester), at 35-37, 39, 47-48, 50-51, 54, 57; doc. no. 87-14 (Deposition of Doug Entz), at 125-26.

[150] *See* doc. no. 66-4 (Exhibit "D": Affidavit of Leonard Schwartz), at 3; *see also* doc. no. 87-11 (Deposition of Rob Spencer), at 12, 21; doc. no. 87-12 (Deposition of Stacy Willis), at 21, 25-26, 28-29, 73, 76, 81; doc. no. 87-14 (Deposition of Doug Entz), at 17-20, 25-27, 74-76, 84, 96-97, 111-

about the issue of which entity bore the responsibility for ensuring that each cooling tower was inspected at least once each month.  Ashland contends that Chugach did not consult with it to determine which cooling towers were to be inspected during an Ashland employee's weekly visit.[151]   Further, Ashland contends that its representatives did not have the authority or the ability to inspect any cooling towers, other than the ones to which they were driven by Dyer.[152]

On the other hand, Chugach asserts that Ashland was required to maintain records of which cooling towers had been inspected each week, in order to ensure that *all* towers were inspected at least once during each calendar month.[153]   Further, Ashland's service representatives were issued a security badge, which Chugach contends allowed Ashland employees access to Redstone Arsenal from Monday through Friday, 7:00 a.m. to 5:00 p.m., and allowed them to drive to different locations on the base without the assistance or escort of Dyer.[154]  Therefore, Chugach asserts that Ashland employees could have driven to the parking lot for Building

---

12, 117, 124-25.

[151] *See* doc. no. 66-4 (Exhibit "D": Affidavit of Leonard Schwartz), at 3-4; *see also* doc. no. 87-11(Deposition of Rob Spencer), at 13, 16, 19, 20-21, 63-64, 70; doc. no. 87-12 (Deposition of Stacy Willis), at 21, 28-29, 81.

[152] *See* doc. no. 66-4 (Exhibit "D": Affidavit of Leonard Schwartz), at 3-4; *see also* doc. no. 87-11(Deposition of Rob Spencer), at 13, 16, 19, 20-21, 63-64, 70; doc. no. 87-12 (Deposition of Stacy Willis), at 21, 28-29, 81.

[153] *See* doc. no. 87-8 (Deposition of Chris Hester), at 53-54.

[154] *Id.* at 63; *see also* doc. no. 87-7 (Deposition of David Dyer), at 141-42.

5681, and inspected the cooling tower at that location without the presence (or escort) of a Chugach employee.[155]

Ashland was contractually required to test free chlorine levels, pH, conductivity, acidity, and the inventory levels of Drew 2215 and Biosperse 3001 during each regular service inspection.[156]  The contract also provided that Ashland was to "run in-plant microbiological evaluations."[157]  Doug Entz, an Ashland corporate representative, testified during his deposition that an "in-plant microbiological evaluation" is a dip slide which tests for bacteria, fungi, and mold.[158] Even so, Ashland asserts that it was only required to conduct a dip slide analysis when the technician was concerned that a particular cooling tower had an elevated level of bacteria.[159]

Following the completion of each service inspection, Ashland's representatives were required to prepare a spreadsheet report for each cooling tower inspected, and

---

[155] *See* doc. no. 87-8 (Deposition of Chris Hester), at 61-63; *see also* doc. no. 87-7 (Deposition of David Dyer), at 142.

[156] *See* doc. no. 87-14 (Deposition of Doug Entz), at 126-27; *see also* doc. no. 87-11 (Deposition of Rob Spencer), at 57-59.

[157] *See* doc. no. 66-2 (Exhibit "B": Solicitation Packet for Boiler and Cooling Water Treatment), at 8.

[158] *See* doc. no. 87-14 (Deposition of Doug Entz), at 126-27.

[159] *See* doc. no. 87-11 (Deposition of Rob Spencer), at 67-68; *see also* doc. no. 87-12 (Deposition of Stacy Willis), at 31, 73-74.

to provide the report to Chugach.[160]  Those reports recorded the following information

for inspections of the Building 5681 cooling tower during the relevant period:[161]

| 2011 Date | pH | Free Chlorine[162] | Conductivity[163] |
|---|---|---|---|
| February 2 | 8.31 | 2.2 | 821 |
| February 24 | 8.28 | 2.18 | 808 |
| **March 24** | 8.39 | 0.00 | 888 |
| **July 14** | 8.9 | 0.08 | 894 |

---

[160] *See* doc. no. 66-4 (Exhibit "D": Affidavit of Leonard Schwartz), at 4; *see also* doc. no. 87-11 (Deposition of Rob Spencer), at 26-27, 77, 80-81; doc. no. 87-12 (Deposition of Stacy Willis), at 25-26, 79.

[161] *See* doc. no. 66-9 (Exhibit "I": Ashland's Weekly Service Reports), at 1-2, 6, 11, 15-16.

[162] According to the OSHA Technical Manual:

> b.  Traditional oxiding agents such as chlorine and bromine have been proven effective in controlling *Legionella* in cooling towers.  Continuous chlorination at low free residual levels can be effective in controlling *Legionella* growth.  It is important, however, that the proper oxidant level be established and maintained because free residual chlorine above 1 ppm may be corrosive to metals in the system and may damage wood used in cooling towers; free residual levels below 1 ppm may not adequately control *Legionella* growth . . . .  Frequent monitoring and control of pH is essential for maintaining adequate levels of free residual chlorine.  Above a pH of 8.0, chlorine effectiveness is greatly reduced . . . .

Doc. no. 67-5 (Exhibit "S": OSHA Technical Manual (OTM), Section III: Chapter 7, Legionnaires' Disease), at ECF 8 (ellipses supplied).  Even so, it appears that the contractual parameters for the pH level in the cooling towers on Redstone Arsenal were between 7.8 and 8.9, as evidenced by the Ashland service inspection reports.  *See* doc. no. 66-9 (Exhibit "I": Ashland's Weekly Service Inspection Reports).

[163] Conductivity measures the ability of water to pass an electrical current.  It is affected by the presence of inorganic dissolved solids.  *See* United States Environmental Protection Agency, 5.9 Conductivity,  http://water.epa.gov/type/rsl/monitoring/vms59.cfm  (last visited May 9, 2014). According to the contract between Ashland and Chugach, the conductivity of the circulating water should range between 650-880 micro-ohms ("MMHO").  *See* doc. no. 66-2 (Exhibit "B": Solicitation Packet for Boiler and Cooling Tower Water Treatment), at 12.

| July 22 | 8.43 | HIGH | 893 |

As evidenced by the foregoing table, there is a 110-day gap — from March 24 to July 14, 2011 — in Ashland's service reports for the cooling tower located at Building 5681.[164]   The issue of whether Ashland, in fact, performed any service inspections at that location during the 110-day gap is disputed.  Chugach contends that service inspections were performed, but that Ashland failed to submit its weekly service reports as a result of its frequent employee turnover.[165]   As proof that inspections were, in fact, conducted during that period, even though not recorded in Ashland's reports, Chugach relies on Dyer's handwritten notes showing that adjustments were made to the chemical feed for that tower.[166]   Dyer testified during his deposition that he relied upon Ashland's representatives for recommendations regarding when the chemical feed needed to be adjusted and, therefore, he asserted that adjustments to the chemical feed were generally only made on occasions when an Ashland representative was present.[167]   Because Dyer noted adjustments to the chemical feed for the Building 5681 cooling tower seven times during the alleged 110-day gap in service, Chugach argues that Ashland did, in fact, perform service

---

[164] *See* doc. no. 66-9 (Exhibit "I": Ashland's Weekly Service Reports).

[165] *See* doc. no. 87-8 (Deposition of Chris Hester), at 64-65, 71-72, 74-77.

[166] *Id.* at 54-55; *see also* doc. no. 87-7 (Deposition of David Dyer), at 53-54, 65-66, 121-22, 138.

[167] *See* doc. no. 87-7 (Deposition of David Dyer), at 50, 53-54, 65-66, 106, 112, 121-22, 138.

inspections.[168]  Even so, Dyer also testified that he periodically adjusted the chemical feed for the cooling tower on his own volition, without the advice of Ashland, whenever he detected the growth of algae.[169]

The cooling tower for Building 5681 was inspected twice in July of 2011: first on July 14th; and again on July 22nd.[170]  Following the inspection on July 14, 2011, Willis reported that "all parameters look good."[171]  Even though the free chlorine level was low on July 14, 2011, Willis testified that he knew the sample was "taken in between cycles and another slug dose would come right behind it and shoot this number up to 2.2."[172]  When the cooling tower was inspected eight days later, the free chlorine level was high at 2.2 ppm.[173]

After Mr. Mueller was diagnosed with Legionnaires' Disease in early August of 2011, Dyer checked the chemical levels in the cooling tower and reported that the tower was "hot," a term meaning that the chemical levels exceeded the targets.[174]

Chugach asserts that Ashland failed to fulfill its contractual obligations as a

---

[168] *Id.* at 46, 49-50, 131-33.

[169] *Id.* at 97-98.

[170] *See* doc. no. 87-12 (Deposition of Stacy Willis), at 17, 77-78.

[171] *Id.* at 43, *see also* doc. no. 66-13 (Exhibit "M": Ashland's July 14, 2011 Service Reports), at ECF 5-6.

[172] Doc. no. 87-12 (Deposition of Stacy Willis), at 44.

[173] *Id.* at 45-46, 61.

[174] *See* doc. no. 87-10 (Affidavit of David Dyer) ¶¶ 15-18.

result of the frequent turnover of inspection technicians in 2011. Chugach argues that, as a result of the frequent turnover, Ashland regularly sent new employees, who were inexperienced, and who had to learn the process of properly servicing cooling towers.[175]    Chugach also contends that the frequent turnover prevented its representatives from developing a working relationship with the Ashland service technicians.[176] In addition, Chugach states that, on many occasions, Ashland sent new representatives without any prior notice, which resulted in security badge issues and, therefore, service problems.[177] Additional problems allegedly were created when an Ashland service technician arrived to perform chemical treatments on the same day that another Ashland representative had delivered products.[178] Chugach contends that, as a result of all of these alleged issues, the Ashland service technicians "could not accomplish their job and complete necessary tasks required under the contract in an efficient manner."[179] Chris Hester testified in his deposition that these issues were discussed during numerous meetings with Ashland.[180]

## C.    Legionnaires' Disease

---

[175] *See* doc. no. 87-8 (Deposition of Chris Hester), at 59-60.

[176] *Id.* at 49-50.

[177] *Id.* at 60-61.

[178] *Id.* at 43.

[179] *Id.* at 43, 74.

[180] *Id.* at 43-44.

The "Legionella Cluster Investigation" conducted by Southern Regional Medical Command provided the following information concerning Legionnaires' Disease:

3.    BIOLOGY OF LEGIONELLOSIS

a.    Etiological Agent.

. . . .

(2) *Legionellae* thrive in warm, aquatic environments and are relatively resistant to the effects of chlorine and heat. *Legionellae* are generally spread through the air by aerosolized water which is then inhaled or microaspirated. Contaminated aerosols come from devices such as cooling towers, showers, and faucets . . . . It is not transmitted from person to person.

b.    Clinical Features.

(1) Legionnaires' disease (*Legionellosis*) is a bacterial infection that was first identified following a 1976 outbreak of pneumonia at an American Legion Convention in Philadelphia. Persons with Legionnaires" [*sic*] disease may present early in the illness with nonspecific symptoms, so it can be difficult to diagnose. Signs of the disease can include: a high fever, chills, and a cough. Some people also suffer from muscle aches and headaches.

(2) Twenty to forty percent (20-40%) of cases exhibit gastrointestinal symptoms. The clinical presentation of Legionnaires" [*sic*] disease is not generally clinically distinguishable from other causes of community-associated pneumonia. This can lead to cases of *Legionellosis* being misdiagnosed. The incubation period

for Legionnaires' disease is 2-10 days with an average of 5-6 days. Chest X-rays are needed to diagnose the pneumonia caused by the bacteria. However, it is not possible to diagnose *Legionellosis* based on radiographic evidence only. Chest radiographs of patients with *Legionellosis* are clinically indistinguishable from those of patients with pneumococcal pneumonia or mycoplasma pneumonia, which are common causes of community-associated pneumonia. Because of this, laboratory testing is required to identify cases of *Legionellosis*. These tests can include cultures or PCR tests on sputum, blood, or lung tissues but the most common diagnostic test is the urine antigen test. A milder infection caused by the same type of *Legionella* bacteria is called Pontiac Fever. Symptoms are similar to Legionnaires' disease with fever, headache, and muscle aches, however, there is no pneumonia. The incubation period for Pontiac Fever is 5-66 hours, most often 24-48 hours. Symptoms of Pontiac Fever go away on their own in two to five days without treatment and without causing further problems . . . .

c.      Epidemiology.

(1) People most at risk of getting sick from infection with *Legionella* bacteria are older people (usually 65 years of age or older), as well as people who are smokers, or those who have a chronic lung disease (like emphysema).

(2) People who have weak immune systems from diseases like cancer, diabetes, or kidney failure are also more likely to get sick when exposed to *Legionella* bacteria. People who take drugs to suppress (weaken) the immune system (like after a transplant operation or chemotherapy) are also at higher risk.[181]

---

[181] Doc. no. 67-1 (Exhibit "O": Legionella Cluster Investigation), at ECF 4-5 (emphasis in original).

**D.      Mr. Mueller's Alleged Exposure to *Legionella***

The HVAC system for Building 5681 included a cooling tower located at the rear of the building.[182]   There was a designated smoking area directly behind the building, and plaintiff testified that her husband regularly spent time in that area.[183] Defendants dispute that testimony, because plaintiff has not identified any other witnesses who can attest to Mr. Mueller's use of the smoking area.

David Dyer described the outside smoking area as "a handicapped concrete ramp that comes up and then goes in the back door," approximately forty feet from the cooling tower.[184]   The expert report submitted by James Davis described the smoking area as located approximately 63 feet north of the cooling tower, and shielded by a wall on the south side and a partial roof over the rear entrance door.[185]

Plaintiff asserts that Mr. Mueller was exposed to *Legionella* when water vapor from the cooling tower drifted to the designated smoking area and was inhaled by her husband.[186]   It should be noted, however, that the cooling tower was equipped with drift eliminators that reduced the amount of water vapor released, and any airborne

---

[182] *See* doc. no. 87-1 (Deposition of Linda Mueller), at 54; *see also* doc. no. 87-2 (Deposition of Scott Bentley), at 65, 164-65.

[183] *See* doc. no. 87-1 (Deposition of Linda Mueller), at 50-51.

[184] *See* doc. no. 87-7 (Deposition of David Dyer), at 149-50.

[185] *See* doc. no. 87-6 (Deposition of Sam Davis, Jr.), at 17, 52-53.

[186] *See* doc. no. 74-1 (Opinion of James Barbaree, Ph.D.), at ECF 3-4; *see also* doc. no. 74-2 (Deposition of James Barbaree, Ph.D.), at 58-59.

drift.[187]  Defendants also assert that the wall and partial roof shielding the smoking area obstructed the movement of water vapor.[188]

It should be noted that plaintiff does not appear to contend that her husband contracted Legionnaires' Disease while *inside* Building 5681.  Indeed, the following facts regarding a person's potential exposure to moisture from the cooling tower while *inside* the building are not in dispute.  Water from the cooling tower circulated through the chillers, but it was not circulated to the air handlers inside the building.[189] Further, the room in which Mr. Mueller worked (151) was serviced by air handler unit number four, which was located on the roof of  Building 5681, and not in close proximity to the cooling tower.[190]  Consequently, it is highly unlikely that moisture from the cooling tower circulated into Room 151.[191]  Even if water vapor somehow entered the air handler circulating air to Room 151, it was removed by the filters and coils that conditioned the air.[192]  In addition, the HVAC system for Building 5681 was programmed to maintain a positive building pressure, compared to the atmospheric pressure outside the building: a fact that also worked to prevent unconditioned

---

[187] *See* doc. no. 87-6 (Deposition of Sam Davis, Jr.), at 36, 51-52.

[188] *Id.* at 52-53.

[189] *See* doc. no. 87-2 (Deposition of Scott Bentley), at 61-63; *see also* doc. no. 87-5 (Affidavit of Chris Hester) ¶¶ 24-26.

[190] *See* doc. no. 87-5 (Affidavit of Chris Hester) ¶¶ 24-26.

[191] *Id.* ¶ 26.

[192] *See* doc. no. 87-6 (Deposition of Sam Davis, Jr.) at 49-50.

outside air from entering the building.[193]

E.     **Mr. Mueller's Onset of Symptoms**

Mr. Mueller became ill in late July of 2011, and exhibited symptoms of lethargy, lack of appetite, and extreme changes in body temperature.[194]  His health continued to worsen over the course of a week until July 29, 2011, when he first visited Dr. Jeffrey Garber, his family physician.[195]  Dr. Garber recommended that Mr. Mueller go directly to Huntsville Hospital, and arranged for him to be admitted.[196]  Following admission, Mr. Mueller was found to be suffering from an undiagnosed problem with his blood count.[197]

During his hospital stay, a urine antigen test was ordered and analyzed by the Mayo Clinic in Jacksonville, Florida.[198]  The results showed that Mr. Mueller tested positive for a *Legionella* bacterial infection, and those results were reported to Huntsville Hospital on August 3, 2011.[199]  One day later, plaintiff was told by the head nurse overseeing her husband's treatment that he had been diagnosed with

---

[193] *See* doc. no. 87-3 (Declaration of James S. Davis, Jr.), at ECF 10.

[194] *See* doc. no. 87-1 (Deposition of Linda Mueller), at 59-61.

[195] *Id.* at 60-61.

[196] *Id.* at 59-63.

[197] *Id.* at 73.

[198] *See* doc. no. 73-1 (Exhibit "A":  Huntsville Hospital Medical Records), at ECF 2-3.

[199] *Id.*

Legionnaire's Disease.[200]  Mr. Mueller remained in the hospital until his death on August 8, 2011.[201]

Mr. Mueller's supplemental death certificate listed the cause of death as pneumonia with respiratory failure due to *Legionella*.[202]  It is important to note, however, that a supplemental medical certification containing that information was prepared by Dr. Garber at plaintiff's request.[203]  The original certificate of death made no reference to *Legionella*.[204]

After Mr. Mueller's death, Dr. Gualtieri, one of his treating physicians, ordered an autopsy for the purpose of identifying the cause of Mr. Mueller's blood count problem.[205]  The autopsy was limited to Mr. Mueller's spleen, and revealed that the blood count problem was "pancytopenia":  a condition in which there is a marked reduction in the number of red and white blood cells and platelets.[206]  *See Dorland's Illustrated Medical Dictionary* 1356 (30th ed. 2003).

## F.    The *Legionella* Cluster Investigation Report

Major General Ted Wong, the Commanding General of the United States

---

[200] *See* doc. no. 87-1 (Deposition of Linda Mueller), at 68.

[201] *Id.* at 59, 67, 72, 93-94.

[202] *See* doc. no. 73-5 (Exhibit "E":  Death Certificate), at ECF 2.

[203] *See* doc. no. 87-1 (Deposition of Linda Mueller), at 93-96.

[204] *See* doc. no. 73-5 (Exhibit "E":  Death Certificate), at ECF 3.

[205] *See* doc. no. 87-1 (Deposition of Linda Mueller), at 72-73.

[206] *Id.* at 74-75; *see also* doc. no. 87-17 (Autopsy Report).

Army's Southern Regional Medical Command, issued Operation Order 11-62 on August 18, 2011, which directed Scott Bentley and Dr. Shannon Ellis to conduct an investigation regarding potential sources of *Legionella* contaimination in Building 5681, and to prepare a report detailing their findings and conclusions.[207]  Bentley and Dr. Ellis were on-site at Redstone Arsenal from August 21–24, 2011 in connection with that investigation.[208]

Scott Bentley served as the Industrial Hygiene Program Manager for SRMC, and he had over thirty years of experience as an industrial hygienist, including experience conducting investigations involving *Legionella*.[209]  He was responsible for overseeing the environmental assessment aspects of the investigation.[210]

Dr. Shannon Ellis, a Lieutenant Colonel in the United States Army, served as the Chief of Preventive Medicine at Winn Army Hospital.[211]  In that capacity, Dr. Ellis was responsible for public health and preventive medicine issues at United States Army posts, and was regularly involved in investigating outbreaks of

---

[207] *See* doc. no. 87-2 (Deposition of Scott Bentley), at 22-23, 26-27, 91-92, 94-95; *see also* doc. no. 87-4 (Deposition of Shannon Ellis, O.D.), at 11, 14-15, 70.

[208] *See* doc. no. 87-2 (Deposition of Scott Bentley), at 28; *see also* doc. no. 87-4 (Deposition of Shannon Ellis, O.D.), at 49.

[209] *See* doc. no. 87-2 (Deposition of Scott Bentley), at 8-9, 16.

[210] *Id.* at 37-38.

[211] *See* doc. no. 87-4 (Deposition of Shannon Ellis, O.D.), at 7-8.

communicable diseases on military bases.[212]  Dr. Ellis has a degree in laboratory medicine, and was familiar with microbiology and the growth of *Legionella* bacteria.[213]  He was responsible for the medical aspects of the investigation.[214]

### 1.    Potential sources of *Legionella* at Building 5681

For purposes of their investigation, Bentley and Dr. Ellis assumed that Mr. Mueller had died of Legionnaires' Disease.[215]  Therefore, they only sought to determine whether the environment of the building in which he had worked was contaminated.[216]

Bentley and Dr. Ellis began their investigation on August 21, 2011, by participating in a comprehensive walk-through of Building 5681, for the purpose of assessing the building and identifying potential sources of *Legionella* contamination.[217]  During their walk-through, Bentley and Dr. Ellis identified the cooling tower and the HVAC system as potential sources of the *Legionella* contamination.[218]

---

[212] *Id.* at 8, 12-13.

[213] *Id.* at 19.

[214] *Id.* at 46.

[215] *Id.* at 150; *see also* doc. no. 87-2 (Deposition of Scott Bentley), at 98.

[216] *See* doc. no. 87-4 (Deposition of Shannon Ellis, O.D.), at 150; *see also* doc. no. 87-2 (Deposition of Scott Bentley), at 98.

[217] *See* doc. no. 87-2 (Deposition of Scott Bentley), at 28-29; *see also* doc. no. 87-4 (Deposition of Shannon Ellis, O.D.), at 17.

[218] *See* doc. no. 87-2 (Deposition of Scott Bentley), at 31.

2.      **Additional, potential cases of *Legionella*-induced illnesses**

A "line listing" of all employees working in Building 5681 who exhibited symptoms that could be linked to *Legionella* was created.[219]  Dr. Ellis then supervised medical evaluations of those employees.[220]  No confirmed cases of Legionnaires' Disease or "Pontiac Fever"[221] were identified, other than that of Mr. Mueller.[222]  Therefore, Dr. Ellis concluded that no other person who worked in Building 5681 had

---

[219] A line listing is a protocol methodology for organizing information during an epidemiological study. *Id.* at 34-35; *see also* doc. no. 87-4 (Deposition of Shannon Ellis, O.D.), at 35-38.  The Legionella Cluster Investigation provides the following summary of the line listing:

> The line listing of employees was a comprehensive attempt to gather all cases, no matter how improbable and unsubstantiated the cases were, in relationship to *Legionella*.  A total of thirteen (13) individuals were identified, however, only two (2) besides the index case, are moderately suspect.  The other individuals reported having sinus infections or upper respiratory infections and were not suspect cases.  Many individuals with symptoms did not get tested, since the individual or his/her physician did not feel it was necessary to be tested . . . .

Doc. no. 67-1 (Exhibit "O":  Legionella Cluster Investigation Report), at ECF 7.

[220] *See* doc. no. 87-4 (Deposition of Shannon Ellis, O.D.), at 38-39.

[221] "Pontiac Fever" is defined as "an influenzalike disease caused by infection with a strain of Legionella pneumophila; characteristics include fever, chills, cough, muscle pain, headache, chest pain, and pleurisy."  *Dorland's Illustrated Medical Dictionary* 687 (30th ed. 2003).

[222] *See* doc. no. 87-4 (Deposition of Shannon Ellis, O.D.), at 38-39.  The Legionella Cluster Investigation provides the following information concerning the case interviews:

> Medical interviews were conducted on-site with spouse of the deceased employee and other employees who were tested and/or had symptoms.  Two (2) employees had probable pneumonia and others had symptoms which might have suggested *Legionella* infection.  A total of eight (8) urine antigen (Ag) tests were documented (either by written report, electronic medical records, or self-reported by employees (see line listing for details)), with all tests being negative.

Doc. no. 67-1 (Exhibit "O":  Legionella Cluster Investigation Report), at ECF 7.

contracted a *Legionella* infection.[223]

Plaintiff denies that Dr. Ellis's conclusion was accurate.  She argues that, because the investigation did not begin until August 21, 2011, the individuals evaluated by Dr. Ellis had recovered from their illnesses, and that any symptoms indicative of Legionnaires' Disease would have been greatly reduced.[224]

Further, plaintiff argues that a co-worker of Mr. Mueller's, Allison Rowland, was diagnosed with Pontiac Fever.[225]  Plaintiff's assertion is based upon the fact that the antibodies test ordered by Rowland's private physician returned positive for *Legionella*.[226]  Further, Rowland testified that she occasionally visited the outside smoking area when she needed to use her cellular telephone, because it was difficult to obtain a signal inside the building.[227]  Even so, the issue of whether Rowland was actually diagnosed with Pontiac Fever appears to be disputed.  Indeed, Rowland testified during her deposition that her treating physician never informed her of such a diagnosis.[228]  In addition, Dr. Ellis testified during his deposition that an antibodies

---

[223] *See* doc. no. 87-4 (Deposition of Shannon Ellis, O.D.), at 46.

[224] *See* doc. no. 99 (Plaintiff's Opposition to Chugach's Motion for Summary Judgment), at 10.

[225] *See* doc. no. 73-3 (Exhibit "C":  Deposition of Dr. Debra Miles Williams), at 32, 33-36, 67-68; *see also* doc. no. 73-4 (Exhibit "D":  Deposition of Allison Rowland), at 65-66.

[226] *See* doc. no. 87-4 (Deposition of Shannon Ellis, O.D.), at 38-39.

[227] *See* doc. no. 73-4 (Exhibit "D":  Deposition of Allison Rowland), at 31-32.

[228] *Id.* at 39.

test could be positive if you were exposed at any time during your lifetime to *Legionella*; whereas, a positive urine antigen test demonstrates that a person was *recently* exposed to *Legionella*.[229]

### 3.    Inspection of the HVAC system

Bentley and Dr. Ellis eliminated the HVAC system as a possible source for the *Legionella* contamination.  There were several reasons for doing so.  They noted that, even though the HVAC system serving Building 5681 was approximately forty years old, it appeared to be well-maintained.[230]  They also observed that the air filters were correctly installed, and changed quarterly.[231]  Further, they found "no evidence [of] loose debris/dirt/dust falling from . . . ductwork onto work surfaces."[232]

Nevertheless, standing water was observed in the condensate-tray areas for air handling units 4 and 8.[233]  Consequently, Bentley and Dr. Ellis recommended that the air handling units be "checked for chilled-water and/or hot water leaks, and the condensate drain should be checked for blockage."[234]  Water samples from air handling units 4 and 8 also were collected to determine the presence of *Legionella*

---

[229] *See* doc. no. 87-4 (Deposition of Shannon Ellis, O.D.), at 38-39.

[230] *See* doc. no. 67- 1 (Exhibit "O": Legionella Cluster Investigation Report), at ECF 11.

[231] *Id.*

[232] *Id.* (alteration supplied).

[233] *Id.*

[234] *Id.* at ECF 11-12.

bacteria, and the results of the laboratory analysis of those samples were negative.[235]

There also was an outstanding work order to repair or replace the vibration connection and steam leak for the Unit 8 Chiller.[236]  Even so, Bentley and Dr. Ellis opined that this deficiency had little impact on the overall efficiency of the HVAC system.[237]

### 4. Water sampling

Prior to the arrival of Bentley and Dr. Ellis on Redstone Arsenal, Cherie Miller, a safety officer at the Arsenal's Fox Army Health Center, collected four water samples from the cooling tower.[238]  Those samples were submitted for *Legionella* testing to "Assured Bio," a laboratory accredited by the American Industrial Hygiene Association and the CDC.[239]  The results of the analysis revealed one colony-forming unit per milliliter of *Legionella pneumophila* in the cooling tower water.[240]  As previously noted in Part I of this opinion, both CDC and OSHA guidelines for cooling towers place the "action level" at concentrations equal to or greater than 100

---

[235] *Id.* at ECF 12.

[236] *See* doc. no. 67-1 (Exhibit "O": Legionella Cluster Investigation Report), at ECF 12.

[237] *Id.*

[238] *See* doc. no. 87-2 (Deposition of Scott Bentley), at 39-41.

[239] *Id.* at 41-43, 45; *see also* doc. no. 87-4 (Deposition of Shannon Ellis, O.D.), at 126-127; *see also* doc. no. 87-18 (Deposition of Merissa McGraw), at 12-13, 17, 32.

[240] *See* doc. no. 87-2 (Deposition of Scott Bentley), at 59-60; *see also* doc. no. 87-4 (Deposition of Shannon Ellis, O.D.), at 20; doc. no. 67-1 (Exhibit "O": Legionella Cluster Investigation), at ECF 62-70.

colony-forming units per milliliter — grossly more than the concentration detected in the water samples collected by Cherie Miller.[241]  That action level requires prompt cleaning of the cooling tower, or  biocide treatment of the system, or both actions.[242]

Even so, Dr. Ellis testified during deposition that the proper *goal* for maintaining a cooling tower is to achieve *zero* colony-forming units per milliliter of *Legionella*.[243]  He opined that a level of zero colony-forming units per milliliter is almost impossible to achieve, however; and, for that reason, a small concentration of *Legionella* is expected in most water systems.[244]

While plaintiff concedes that a small concentration of *Legionella* is to be expected, she contends it should not also be characterized as "safe."  To support that argument, she relies upon Dr. James Barbaree's statement that he did not believe a CDC epidemiologist who was experienced with Legionnaires' Disease outbreaks would agree with the notion that a level of *Legionella* as low as one colony-forming unit per milliliter was "safe."[245]

In addition, plaintiff challenges the accuracy of the analysis conducted by

---

[241] *See* doc. no. 87-2 (Deposition of Scott Bentley), at 60; *see also* doc. no. 87-4 (Deposition of Shannon Ellis, O.D.), at 20-22, 25-26, 88-90, 146; doc. no. 67-5 (Exhibit "S":  OSHA Technical Manual (OTM)-Section III, Chapter 7: Legionnaires' Disease), at ECF 20-21.

[242] *See* doc. no. 87-4 (Deposition of Shannon Ellis, O.D.), at 26.

[243] *Id.* at 146.

[244] *Id.* at 89-90, 151.

[245] *See* doc. no. 74-1 (Opinion of James Barbaree, Ph.D.), at ECF 5.

Assured Bio laboratory, because Merissa McGraw agreed with plaintiff's counsel during her deposition that the samples submitted to analysis were "deficient."[246] According to McGraw, those samples were deficient because only 90 milliliters of water were supplied to the laboratory, whereas at least 250 milliliters allegedly are needed for a competent evaluation.[247]   McGraw testified that she notified representatives at Fox Army Health Center that a sample size of 250 milliliters was needed, that the representatives emailed her back and asked for additional water sample kits, that McGraw sent a second email asking how many kits should be sent, but she never received a response.[248]   Therefore, additional samples were not submitted.[249]  A larger sample size is preferred because it has increased sensitivity to the amount of *Legionella* present.[250]  Even so, McGraw testified that she could only speculate as to how much a proper sample size would have altered the results.[251]

Plaintiff also contends that, after the low free chlorine reading on July 14, 2011, Ashland increased the chemical exposure time by twenty minutes.[252]  Thus,

---

[246] *See* doc. no. 75-2 (Deposition of Merissa McGraw), at 22.  Merissa McGraw is employed by Assured Bio, and is responsible for "the DNA side of the laboratory."  *Id.* at 6.

[247] *Id.* at 21-22.

[248] *Id.* at 25.

[249] *Id.*

[250] *Id.* at 20-21.

[251] *Id.* at 43-44.

[252] *See* doc. no. 99 (Plaintiff's Opposition to Chugach's Motion for Summary Judgment), at 10 (citing doc. no. 87-7 (Deposition of David Dyer), at 58-59).

plaintiff argues that the additional exposure time would have killed the vast majority of *Legionella* present in the cooling tower water during the period of time in which Mr. Mueller was exposed to *Legionella*.[253]

### 5.    Inspection of the cooling tower and maintenance records

During the course of their investigation, Bentley and Dr. Ellis inspected the cooling tower for Building 5681 and its biocide injection system — a system that is designed to prevent the growth of bacteria such as *Legionella* — and concluded that the system was functioning properly.[254]   Bentley and Dr. Ellis also did not observe any overflows or pooling of water around the cooling tower that could have contributed to the growth of *Legionella*.[255]   Maintenance personnel also removed a panel to allow inspection of the cooling tower's interior basin, and Bentley observed that it appeared clean and well-maintained.[256]

Bentley reviewed operational procedures, inspection and preventive maintenance logs, the inspection checklist, and maintenance records, and testified that he did not identify any outstanding, uncompleted maintenance issues, or any violation

---

[253] *Id.*

[254] *See* doc. no. 87-2 (Deposition of Scott Bentley), at 41-42, 53-54, 112; *see also* doc. no. 87-4 (Deposition of Shannon Ellis, O.D.), at 46-47, 74, 122.

[255] *See* doc. no. 87-2 (Deposition of Scott Bentley), at 61; *see also* doc. no. 87-4 (Deposition of Shannon Ellis, O.D.), at 20-24.

[256] *See* doc. no. 87-2 (Deposition of Scott Bentley), at 63.

of protocols.[257]  For all of those reasons, Bentley concluded that the cooling tower had

been properly maintained, and that chemical treatments were applied at appropriate

intervals.[258]

Plaintiff agrees that those were Bentley's conclusions, but contends that they

were incorrect.[259]

Based upon Bentley's visual inspection of the cooling tower, his review of the

maintenance records, his discussions with operators, and his review of the results of

Assured Bio's laboratory report, Bentley concluded that the cooling tower was not

the source of Mr. Mueller's *Legionella* contamination.[260]  Again, plaintiff admits that

was Bentley's conclusion, but does not agree that his conclusion was correct.[261]

### 6.     Investigatory conclusions

At the conclusion of their investigation, Bentley and Dr. Ellis prepared a report

summarizing their findings.[262]

Based on the results and observations made during this investigation,
there is no evidence to link the building environment to *Legionella*.

---

[257] *Id.* at 52-53, 57.

[258] *Id.* at 58-59, 63-64, 181-82.

[259] *See* doc. no. 99 (Plaintiff's Opposition to Chugach's Motion for Summary Judgment), at
12.

[260] *See* doc. no. 87-2 (Deposition of Scott Bentley), at 103.

[261] *See* doc. no. 99 (Plaintiff's Opposition to Chugach's Motion for Summary Judgment), at
12.

[262] *See* doc. no. 67-1 (Exhibit "O":  Legionella Cluster Investigation Report).

Medical evaluation concluded that there were no other confirmed cases of *Legionella* infection among the group and there was no evidence to suggest the worker who died of *Legionella* contracted the infection in the workplace.[263]

A list of recommendations to address potential environmental hazards in Building 5681 was included.[264]  Even so, no recommendations related to the cooling tower, or the use of additional chemical treatments to aid in the elimination of *Legionella*.[265]

## G.    Dr. Barbaree's Report

In direct contradiction to the results of the Legionella Cluster Investigation conducted by Bentley and Dr. Ellis, Dr. James Barbaree concluded that, "to a reasonable degree of scientific certainty . . . Mark A. Mueller (deceased) contracted Legionnaires' Disease while working and being around the cooling tower at building 5681, Redstone Arsenal, Alabama."[266]  As described in Part I.C.2, *supra*, his conclusion was based on four factors: (1) other "employees exhibiting symptoms that could have been connected with LD [*i.e.*, Legionnaires' Disease]"; (2) the fact that *Legionella pneumophila* and other species of *Legionella* were found in water samples taken from the cooling tower; (3) records showing that the preventive maintenance

---

[263] *Id.* at ECF 15.

[264] *Id.* at ECF 15-18.

[265] *Id.*

[266] *See* doc. no. 74-1 (Opinion of James Barbaree, Ph.D.), at ECF 2.

71

on the cooling tower at Building 5681 was "questionable in being effective"; and (4) the fact that Mr. Mueller "spent time around the cooling tower since he often smoked in that area."[267]

## IV. DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

### A.    Count One:  Plaintiff's Negligent Maintenance Claim

Count One of plaintiff's second amended complaint asserts claims against both defendants for negligent maintenance of the HVAC system of Building 5681.[268] Defendants argue that this claim fails for lack of evidence.[269]

A negligence claim based upon Alabama law requires a plaintiff to prove four elements:  defendant owed plaintiff a duty of reasonable care; defendant breached that duty; plaintiff suffered a loss or injury; and, defendant's breach was the actual and proximate cause of plaintiff's loss or injury.  *See Ford Motor Co. v. Burdeshaw*, 661 So. 2d 236, 238 (Ala. 1995).  Defendants argue that plaintiff has failed to produce evidence establishing that Mr. Mueller died of Legionnaires' Disease.  Defendants also assert that plaintiff has produced no evidence that they breached any duty owed to Mr. Mueller, or that any alleged breach was the proximate cause of his death.

---

[267] *Id.* at ECF 3-4 (alterations supplied).

[268] *See* doc. no. 18 (Second Amended Complaint), at 4.

[269] *See* doc. no. 65 (Ashland's Brief in Support of its Motion for Summary Judgment), at 18; *see also* doc. no. 86 (Chugach's Brief in Support of its Motion for Summary Judgment), at 17-25.

This court addressed defendants' arguments concerning the admissibility of the results of the urine antigen test conducted by the Mayo Clinic in Part I.A.2 of this opinion, *supra*, and held that those results may be considered when ruling upon the present motions.  Therefore, the argument that plaintiff has not presented evidence establishing that Legionnaires' Disease was the cause of Mr. Mueller's death is rejected here, for purposes of the present motion.

With regard to defendants' argument that plaintiff has failed to produce evidence that they breached a duty owed to Mr. Mueller, this court finds that there are genuine issues of material fact which preclude the entry of summary judgment. First, Ashland had a contractual duty to inspect each of the cooling towers on Redstone Arsenal at least once a month, and to adjust the chemical composition of the waters, if the inspection indicated a need for doing so.  Even so, Ashland has admitted that there is a 110-day gap in its service records for the cooling tower at Building 5681. Further, the question of whether Chugach or Ashland bore the responsibility for ensuring that each cooling tower was inspected at least once each month is clearly a genuine issue of material fact.

As stated in Part I.C.4.a, *supra*, Dr. Barbaree may not testify regarding the prevailing industry standards for cooling tower maintenance; however, he may testify regarding the water conditions in which *Legionella* thrives.  Further, Dr. Barbaree's

testimony regarding those water conditions is relevant in determining whether defendants breached a duty of care owed to Mr. Mueller.  Dr. Barbaree stated in his expert report that the pH level should be maintained *below* 8.0 ppm — generally between 7.2 and 7.6 ppm — so that chlorine is free to react with bacteria present in the water.[270]  Even so, the pH levels recorded on six different dates during the months of January through July of 2011 were all *above* 8.2 ppm.[271]  Dr. Barbaree also stated that chlorine should be maintained at a level greater than 2.0 ppm.[272]  Even so, no free chlorine was reported on either February 15  or March 24, 2011, and only 0.8 ppm of chlorine was recorded on July 14, 2011.[273]  Based upon those records, Dr. Barbaree concluded that the effectiveness of the preventive maintenance at Building 5681 in reducing *Legionella* was questionable.[274]

Plaintiff has not provided expert testimony regarding the standard of care for the maintenance of cooling towers, or whether that standard was violated in this case. Even so, the court finds that the evidence of a 110-day gap in service records, coupled with Dr. Barbaree's testimony that the water chemistry was such as to foster the growth of *Legionella,* creates a genuine issue of material fact as to whether

---

[270] *See* doc. no. 74-1 (Opinion of James Barbaree, Ph.D.), at ECF 5.

[271] *Id.*

[272] *Id.*

[273] *Id.*

[274] *Id.*

defendants breached a duty owed to Mr. Mueller.

Defendants also assert that plaintiff has failed to present evidence showing that any alleged breach of duty was the proximate cause of Mr. Mueller's death.  Upon consideration, however, the court finds that genuine issues of material fact clearly exist.  First, there are the competing conclusions of Dr. Barbaree's report, and that of the Legionella Cluster Investigation conducted by Bentley and Dr. Ellis, regarding the pivotal issue of whether there was a causal linkage between Mr. Mueller's contraction of Legionnaires' Disease and his work environment.  In addition, the parties dispute whether a level of one colony-forming unit per milliliter of *Legionella pneumophila* is safe, or whether it is a sufficient concentration to pose a health risk to humans.  The parties also are in disagreement  as to whether the results derived from the water samples collected by Cherie Miller accurately reflected the concentration of *Legionella* in the cooling tower water, due to the deficient size of those samples.  Finally, there are genuine issues of material fact regarding the questions of whether Mr. Mueller frequented the outside smoking area on a regular basis, and whether water vapor from the cooling tower could have drifted to that location.

For all of the foregoing reasons, defendants are not entitled to summary judgment on plaintiff's negligence claim.

75

**B.      Counts Two through Four:  Plaintiff's Negligent Hiring, Training, and Supervision Claims**[275]

**1.      Chugach's motion**

Chugach argues that plaintiff's negligent hiring and training claims are due to be dismissed because plaintiff has not presented substantial evidence that Chugach hired improper persons, or that any of its employees engaged in wrongful conduct.[276] In addition, Chugach asserts that plaintiff cannot produce substantial evidence establishing that any of its employees were incompetent because of a lack of training.[277]

While Section II(D) of plaintiff's opposition brief is entitled "Substantial Evidence Forecloses Summary Judgment on the Issue of Negligent Hiring, Training, and Supervision," plaintiff only addressed the negligent *supervision* aspect of the claim alleged in Count Four of her Second Amended Complaint, and not her claims of negligent *hiring* (Count Two) and *training* (Count Three).[278]  Therefore, plaintiff has effectively abandoned her claims for negligent *hiring* and *training*.  Issues and

---

[275] Plaintiff's claims of negligent hiring and training closely resemble the analysis of a claim for negligent supervision.  *See Sanders v. Shoe Show, Inc.*, 778 So. 2d 820, 824 (Ala. Civ. App. 2000).  Even so, plaintiff asserted claims of negligent hiring, training, and supervision as separate counts in her second amended complaint.  *See* doc. no. 18 (Second Amended Complaint).

[276] *See* doc. no. 86 (Chugach's Brief in Support of its Motion for Summary Judgment), at 26-27.

[277] *Id.* at 27-29.

[278] Doc. no. 99 (Plaintiff's Opposition to Chugach's Motion for Summary Judgment), at 28-29.

contentions not raised in a party's brief are deemed abandoned. *See, e.g.*, *Chapman v. AI Transport*, 229 F.3d 1012, 1027 (11th Cir. 2000) (*en banc*) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)).

> In opposing a motion for summary judgment, a party may not rely on his pleadings to avoid judgment against him.  There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned . . . .

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citations and internal quotation marks omitted).

The heading to Count Four of plaintiff's second amended complaint clearly indicates an intention to assert a negligent *supervision* claim against *both* Chugach *and* Ashland ("Negligent/Wanton Supervision of Chugach Federal Solutions, Inc. and

77

Ashland, Inc."), although plaintiff's counsel erroneously framed the allegations of that Count in the singular, rather than plural:  *i.e.*, "The *Defendant*[s] negligently . . . supervised *employees*, during their employment with the Defendant[s].  This negligent . . . supervision allowed *employees* to negligently . . . maintain the air conditioning and heating system located at Building 5681 of the Redstone Arsenal, which caused MARK A. MUELLER to suffer serious medical conditions and ultimately cause[d] his death."[279]

Moreover, when responding to defendants' summary judgment motions, plaintiff's counsel altered the theory of this claim, and argued that "the negligent supervision claim against *Chugach* focuses on whether *Chugach*, [acting] through its employees [*i.e.*, Hester and Dyer], kept track of *Ashland's* activities competently."[280]

This revised iteration of plaintiff's negligent supervision claim is due to be dismissed, because plaintiff cannot use her summary judgment brief to assert a new claim that was not pled in her complaint.  *See Davis v. Coca-Cola Bottling Co. Consolidated*, 516 F.3d 955, 977 (11th Cir. 2008) (providing that a plaintiff cannot raise a claim in a brief that was not pled in the complaint); *see also Grimsley v. Marshalls of MA, Inc.*, 284 F. App'x 604, 610-11 (11th Cir. 2008) (affirming the

---

[279] Doc. no. 18 (Second Amended Complaint) ¶ 27 (alterations and emphasis supplied, capitalization in original).

[280] Doc. no. 99 (Plaintiff's Opposition to Chugach's Motion for Summary Judgment), at 28-29 (emphasis and alterations supplied).

dismissal of a claim first raised in a summary judgment brief).

### 2.    Ashland's motion

Ashland argues that plaintiff's negligent hiring and training claims are due to be dismissed because she has not produced substantial evidence that any Ashland employee was incompetent or unfit, or that Ashland knew (or should have known) of any such alleged incompetence or unfitness.[281]   As with plaintiff's opposition to Chugach's motion for summary judgment, plaintiff stated in a heading to one section of her opposition brief that "Substantial Evidence Forecloses Summary Judgment on the Issue of Negligent Hiring, Training, and Supervision," but the discussion that followed that heading only addressed her negligent *supervision* claim, and not her claims for negligent *hiring* and *training*.[282]   Therefore, for the reasons discussed in the preceding subsection, plaintiff has effectively abandoned her claims of negligent *hiring* and *training* against *Ashland*.  *See, e.g.*, *Chapman*, 229 F.3d at 1027.

Ashland argues that summary judgment should also be granted on plaintiff's claim for negligent *supervision*.   Alabama law defines the claim of negligent supervision in the following manner:

> In the master and servant relationship, the master is held

---

[281] *See* doc. no. 65 (Ashland's Brief in Support of its Motion for Summary Judgment), at 19-23.

[282] Doc. no. 99 (Plaintiff's Opposition to Chugach's Motion for Summary Judgment), at 28-29.

responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him. Liability depends upon its being established by affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge.  It is incumbent on the party charging negligence to show it by proper evidence.  This may be done by showing specific acts of incompetency and bringing them home to the knowledge of the master, or by showing them to be of such nature, character, and frequency that the master, in the exercise of due care, must have them brought to his notice.  While such specific acts of alleged incompetency cannot be shown to prove that the servant was negligent in doing or omitting to do the act complained of, it is proper, when repeated acts of carelessness and incompetency of a certain character are shown on the part of the servant to leave it to the jury whether they would have come to his knowledge, had he exercised ordinary care.

*Lane v. Central Bank of Alabama, N.A.*, 425 So. 2d 1098, 1100 (Ala. 1983) (internal quotation marks omitted) (quoting *Thompson v. Harvard*, 235 So. 2d 853, 858 (Ala. 1970)); *see also Sanders v. Shoe Show, Inc.*, 778 So. 2d 820, 824 (Ala. Civ. App. 2000).

The court finds that there are genuine issues of material fact on the following questions:  whether Ashland's service technicians can be considered incompetent or unfit for their job; whether Ashland had knowledge of any incompetence; and whether Ashland's disregard of those service technicians' alleged incompetence caused Mr. Mueller's death.  Specifically, there was an alleged high turnover rate among the service technicians sent to Redstone Arsenal by Ashland, and those new

80

employees allegedly were inexperienced with cooling towers.[283]   In addition, Chris Hester testified that he had numerous discussions with Ashland's representatives about problems with the services provided.[284]   Furthermore, Doug Entz, an Ashland corporate representative, stated during deposition that Ashland had not instituted a system of checks and balances, to ensure that all cooling towers were inspected on a monthly basis.[285]   Accordingly, Ashland's motion for summary judgment will be denied with regard to plaintiff's claim for negligent supervision.

## C.    Plaintiff's Wantonness Claims

Plaintiff's second amended complaint also alleged that:  defendants wantonly failed to maintain the HVAC system and cooling tower at Building 5681 (Count One); defendants were wanton in their hiring practices (Count Two); and, defendants wantonly failed to train and supervise their employees (Counts Three and Four).[286]

Defendants assert that plaintiff cannot present substantial evidence establishing that they undertook any act, or failed to undertake any act, with knowledge that injury was likely to occur.  In response, plaintiff states that she does not object to the entry of summary judgment in favor of defendants on her wantonness claims.  Therefore,

---

[283] *See* doc. no. 87-8 (Deposition of Chris Hester), at 59-60.

[284] *Id.* at 43-44.

[285] *See* doc. no. 87-14 (Deposition of Doug Entz), at 22, 24.

[286] *See* doc. no. 18 (Second Amended Complaint), at 4-7.

summary judgment will be entered in favor of defendants on those claims.

## D.     Claims Asserted by Plaintiff in Her Individual Capacity, or for Compensatory Damages

Plaintiff's second amended complaint states that she asserts claims "individually and in her own capacity as Personal Representative of the Estate of Mark A. Mueller[,]" and that she seeks recovery of *compensatory* and punitive damages.[287]  The Alabama Wrongful Death Act states that:

> (a) *A personal representative* may commence an action and recover such damages as the jury may assess in a court of competent jurisdiction within the State of Alabama . . . for the wrongful act, omission, or negligence of any person, persons, or corporation, his or her or their servants or agents, whereby the death of the testator or intestate was caused, provided the testator or intestate could have commenced an action for the wrongful act, omission, or negligence if it had not caused death.

Ala. Code § 6-5-410(a) (1975) (2005 Replacement Vol.) (emphasis supplied).  It is black letter Alabama law that only *punitive* damages may be recovered in wrongful death actions.  *See, e.g., Trott v. Brinks, Inc.*, 972 So. 2d 81, 84-85 (Ala. 2007); *see also Simmons v. Pulmosan Safety Equipment Corp., Inc.*, 471 F. Supp. 999, 1001 (S.D. Ala. 1979).

Ashland argues that, because the Wrongful Death Act specifies that only a *personal representative* may commence an action, it is entitled to summary judgment

---

[287] *See* doc. no. 18 (Second Amended Complaint), at 1, 5, 6, 7 (alteration supplied).

on any claims asserted by plaintiff in her *individual capacity*.  In addition, both defendants argue that plaintiff cannot recover the compensatory damages sought in her second amended complaint.

In response, plaintiff states that she is only seeking "damages for wrongful death stemming from the death of her husband, Mr. Mueller."[288]  Therefore, plaintiff implicitly concedes that summary judgment is due to be entered in favor of defendants on any individual claims she may have attempted to assert, and on her claims for compensatory damages.

## V. ASHLAND'S MOTION FOR SUMMARY JUDGMENT ON CHUGACH'S CROSSCLAIMS

### A.    Breach of Contract

In its crossclaim, Chugach asserts that Ashland breached the subcontract by: "(1) supplying defective chemicals that failed to prevent the growth of *Legionella* bacteria; (2) failing to properly monitor the chemical levels in the cooling tower for Building 5681; and (3) failing to properly maintain the automatic biocide injector system on the cooling tower for Building 5681."[289]  Even so, Chugach stated in its opposition that it "has not identified sufficient evidence to support its contention the

---

[288] *See* doc. no. 72 (Plaintiff's Opposition to Ashland's Motion for Summary Judgment), at 31; *see also* doc. no. 99 (Plaintiff's Opposition to Chugach's Motion for Summary Judgment), at 29.

[289] Doc. no. 22 (Chugach's Crossclaims), at 5.

chemicals were defective[,]" and, therefore, does not intend to pursue the breach of contract claim on that ground.[290]

To prevail on a breach of contract claim, a plaintiff must show: "(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *Ex parte Steadman*, 812 So. 2d 290, 293 (Ala. 2001) (quoting *Southern Medical Health Systems, Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995)). Summary judgment is only appropriate when "the contract is unambiguous and the facts undisputed." *Ex parte Awtrey Realty Co., Inc.*, 827 So. 2d 104, 107 (Ala. 2001) (quoting *P & S Business, Inc. v. South Central Bell Telephone Co.*, 466 So. 2d 928, 931-32 (Ala. 1985)), *overruled on other grounds by White Sands Group, LLC v. PRS II, LLC*, 32 So. 3d 5 (Ala. 2009).

Here, the facts are anything but undisputed. Indeed, there are genuine issues of material fact concerning the questions of: whether the contract between Ashland and Chugach *Management Services* was later transferred to defendant Chugach *Federal*; whether the contract provision requiring all cooling towers to be inspected monthly was modified through the parties' course of performance; whether Ashland failed to test the cooling tower at Building 5681 over a 110-day period; whether

---

[290] Doc. no. 70 (Chugach's Opposition to Crossclaim Defendant Ashland's Motion for Summary Judgment), at 11-12, n.1.

Ashland or Chugach was responsible for ensuring that all cooling towers were visited monthly; whether Ashland was responsible for maintaining the biocide pumping system; and whether Ashland's service technicians had the authority to inspect cooling towers other than those to which they were escorted by Dyer.

Therefore, Ashland's motion for summary judgment on Chugach's crossclaim for breach of contract will be denied.

## B.   Common Law Indemnity

Ashland argues that Chugach's crossclaim for common law indemnity is due to be dismissed, because Ashland and Chugach are alleged joint tortfeasors. Ashland is correct when asserting that, as a general rule, there is no right of indemnity or contribution among joint tortfeasors under Alabama law. *See, e.g., Kennedy Engine Co. v. Dog River Marina & Boatworks, Inc.*, 432 So. 2d 1214, 1215 (Ala. 1983) ("Alabama law does not recognize actions for indemnity or contribution from joint tortfeasors."); *Parker v. Mauldin*, 353 So. 2d 1375, 1377 (Ala. 1977). Even so, there are a few notable exceptions: *i.e.*, "a joint wrongdoer may claim indemnity where he has not been guilty of any fault, except technically or constructively, or where both parties are at fault, but the fault of the party from whom indemnity is claimed was the proximate or primary cause of the injury." *Crigler v. State*, 438 So. 2d 1375, 1385 (Ala. 1983) (citing *Mallory S.S. Co. v. Druhan*, 84 So. 874 (Ala. 1920)).

85

Chugach asserts that both exceptions apply.  Chugach first argues that Ashland has failed to present evidence showing that it was guilty of any fault.  As support for that contention, Chugach states that it relied exclusively on Ashland for the inspections of the cooling towers, and any resulting recommendations regarding adjustments to the chemical feed.  In addition, Chugach contends that, even if this court finds that it was at fault, Ashland's fault was the proximate cause of Mr. Mueller's death, because any *Legionella* present in the cooling tower would have been a result of Ashland providing ineffective chemical treatments.

Upon consideration, the court finds that there are genuine issues of material fact concerning whether Chugach was guilty of any fault, and which defendant, if any, was the proximate cause of Mr. Mueller's death.  Therefore, summary judgment will be denied on Chugach's crossclaim for common law indemnity.

## VI. CONCLUSION

An appropriate Order, consistent with this Memorandum Opinion, will be entered contemporaneously herewith.

DONE and ORDERED this 25th day of June, 2014.

_____
United States District Judge